STATE OF CONNECTICUT *v.* PAUL GERAK

HOUSE, C. J., LOISELLE, MACDONALD, LONGO and BARBER, Js.

Argued May 6—decision released August 5, 1975

*Michael L. Riccio,* for the appellant (defendant).

*Walter D. Flanagan,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Richard F. Jacobson,* assistant state's attorney, for the appellee (state).

MacDONALD, J. The defendant, having been found guilty of manslaughter in violation of § 53-13 of the General Statutes, has appealed from the judgment of the trial court rendered upon the verdict of the jury. The defendant has assigned error in the court's charge, claiming that the court's comments upon the evidence gave greater weight to the state's evidence, and that the court incorrectly defined the elements of the crime of manslaughter. Further error is claimed in the court's failure to direct a verdict for the defendant and, thereafter, in failing to set aside the verdict.

Upon the trial of the case to the jury the state offered evidence to prove and claimed to have proved the following facts: Julia Diaz resided with her husband, Gregorio Diaz, and family at 554 Arctic Street in Bridgeport. They occupied a second-floor apartment in a three-story building containing six apartments. On the evening of September 15, 1971, she and her husband went to bed at 10 or 10:30 p.m. Their bedroom window was in the rear of the house. At dawn on the morning of September 16 the noise of a gunshot caused her

to be awakened, and she went to the bedroom window from which she could see her neighbor's yard. Her husband arose from bed and came to the window. A venetian blind, which was drawn closed, covered all of the window, and she looked out of the window by peeking through the slats of the venetian blind. Everything outdoors was illuminated so that she was able to observe the defendant, who owned the house next door, standing below the fire escape next to the steps, with a firearm in his hand, shooting up toward the third floor. She did not observe any other persons in that area of the yard. In response to a question from her husband she replied that the man next door was shooting up their way. Just as she left the window and walked in the direction of the bathroom, she heard her husband fall. She turned on the light and looked at him on the floor. There was a hole in the venetian blind that was not there prior to the time that she heard her husband fall. Prior to his fall she had heard three shots. She heard no shots after he fell. Dr. Harold E. Doherty, medical examiner for the city of Bridgeport, arrived at the scene at 3 a.m. and observed Diaz lying on his back with a bullet wound in his left temple. There was no exit wound and there was no other evidence of trauma. An ambulance physician had pronounced Diaz dead at 2:40 a.m. The autopsy, subsequently performed, revealed the exact cause of death to be a gunshot wound of the left temple.

Pasquale Federici, who resided at 552 Arctic Street, was sleeping outside on his porch on September 16 when he heard four shots. In the rear of the Diaz house each floor had a light containing a 150 watt bulb that was automatically controlled to go off at 6 a.m. Detective William A. Walker

of the Bridgeport police department arrived at the scene shortly after 2 a.m. and observed the hole in the venetian blind. The lighting was not really bright but was bright enough to distinguish anyone who might be in the area on the ground. Patrolman Inde M. Faria descended the back stairs of the decedent's apartment and found the stairs and the area to be illuminated.

The police then went to the defendant's house where it was necessary to force entry into his apartment. There were no lights on and the defendant was sitting on the bed wearing "long johns." A .22-caliber gun owned by the defendant was found underneath a pile of papers on a cart in the kitchen. At 3 p.m. on September 16, the police returned to the defendant's apartment with a search warrant and seized three boxes of bullets (state's exhibit N), and also one box of Peters .22-caliber short, rim fire cartridges; one box of Peters .22-caliber blank cartridges; one empty box labeled Remington .25-caliber automatic; and two boxes of Remington Kleanbore .22-caliber long rifle cartridges bearing lot No. R17L.

Detective Alexander J. Wlcek dug out six bullets from the area above the third floor apartment of the Diaz residence. He determined that their trajectory was from down and left. Sergeant James E. McDonald of the Connecticut state police department examined four of these six bullets (state's exhibits Q1, Q2, Q3, Q4) and the bullet removed from the decedent's head (state's exhibit I), and determined that they were not fired from the handgun found in the defendant's apartment. He also examined two boxes of bullets (state's exhibit R) taken from the defendant's apartment, micro-

scopically comparing them with exhibits Q1, Q2, Q3, Q4 and I, and concluded that they were similar in class characteristics and that they were made at the same time, 1937, and were copper cartridge bullets. State's exhibit R consisted of Remington Kleanbore .22-caliber long rifle cartridges. Exhibits Q2 and Q4 were found to be similar in class characteristics to Q1. McDonald classified these bullets as rare. The mayor's office had no record of a permit for the defendant to discharge a gun within city limits.

The defendant offered evidence to prove and claimed to have proved the following: Mrs. Diaz observed a person identified as the defendant standing next door with either a pistol or a revolver in his hand. There was not enough light for her to determine whether the man standing next door was wearing garments of any color other than gray. The weather bureau report for September 16, 1971, indicates "ground fog" during the observations made at midnight, 1 a.m. and 4 a.m. The decedent owned a revolver and had it in his bedroom on September 16, 1971. There was no police record of any arguments or difficulties between members of the Diaz household and the defendant prior to September 16, 1971, and, in fact, no one in the Diaz family had ever spoken with the defendant. Detective Wlcek did not check the trajectory of the bullet fired through the Diaz bedroom window on the second floor, but he did check the trajectory of the bullet that went through the third floor window. Sergeant McDonald stated that the vertical line appearing on the test bullet (Q1) is known as a land impression, the land being the raised part or striations within the rifle. The marking on the test bullet beyond the land impression was the deformity of the bullet from going through the barrel in the

rifle. State's exhibit R is a box of Remington Klean-bore .22-caliber long rifle cartridges, lot No. R17L, which were manufactured in the millions in 1937. Sergeant McDonald determined that manufacture of these cartridges had stopped over thirty years ago, by his own personal knowledge and by a check of the lot number on the box, which he stated was RO5-O. It is entirely possible that bullets of this type are still possessed by many individuals. Exhibits I, Q1 and Q4 could not have been fired by the weapon found in the defendant's apartment and it is a probability that none of these bullets could have been fired by any pistol or revolver. It is a probability that these bullets were fired by a rifle; their class characteristics are associated with test bullets fired from rifles as opposed to pistols. The defendant lived in a three story building housing twelve units and had not returned to his apartment since his arrest in the early morning hours of September 16, 1971, prior to the second search on that date. All the units in the building were searched by the police, and no weapon other than the defendant's pistol was found during the two searches of his apartment.

The defendant has assigned error in that portion of the charge in which the court commented to the jury on its recollection of the evidence. Recently, in *Anderson & McPadden, Inc.* v. *Tunucci,* 167 Conn. 584, 590–91, 356 A.2d 873, we had occasion to discuss the standards by which such comments are to be weighed, both as to necessity and propriety. In response to the defendant's exceptions, noting that portions of the evidence favorable to him were omitted from the court's original instructions, the court, prior to giving the case to the jury, substantially cured by

supplemental instructions any harm that might have resulted from its original comments. As to the effect of its comments on the evidence, the court gave substantial cautionary instructions in the original and supplemental charge; these, coupled with the supplemental comments, incorporating the omitted evidence of which the defendant complained, demonstrate that the court did not abuse its discretion nor interfere with the jury's function as the trier of fact. *Anderson & McPadden, Inc.* v. *Tunucci,* supra.

The next assigned error relates to the court's charge as to the law of manslaughter, at that time defined by common law.[1] Initially, the state argues that the defendant did not properly except to this portion of the court's instructions and that we may not review this claim of error. After the court had supplemented its instructions to the jury with regard to the evidence produced, counsel for the defendant took the following exception: "Your Honor, with all due respect to the Court, for the record, on behalf of the defendant, I would like to take an exception to the charge as a whole. The defendant takes exception to the overall charge as not being an accurate representation of the Connecticut Law on manslaughter, reasonable doubt, credibility of witnesses, circumstantial evidence and the absence of the obligation of the accused to take the stand in his own defense. And the defendant further takes exception on the basis that the Court's comments on the facts were not an accurate presentation of the actual facts produced in evidence." The defendant's counsel had previously excepted to the court's comment upon the

---

[1] The penal code, title 53a of the General Statutes, was not effective at the time of the conduct upon which the charge was grounded.

evidence and also to the court's instruction as to the effect of the defendant's violation of General Statutes § 53-203, relative to the discharge of weapons within the city limits, which the defendant claimed was not introduced into evidence and the violation of which was not alleged in the information.

Section 249 of the Practice Book requires that "[c]ounsel taking the exception shall state distinctly the matter objected to and the ground of objection," and we have refused to review claims of error in the charge where no exceptions were taken nor any request to charge made. *State* v. *Malley,* 167 Conn. 379, 383, 355 A.2d 292; *State* v. *Van Valkenburg,* 160 Conn. 171, 174, 276 A.2d 888; *State* v. *Taylor,* 153 Conn. 72, 86, 214 A.2d 362, cert. denied, 384 U.S. 921, 86 S. Ct. 1372, 16 L. Ed. 2d 442. We have also refused to review claims founded upon indistinct exceptions which could not fairly be said to have apprised the trial court of the error claimed; *Prystash* v. *Best Medium Publishing. Co.,* 157 Conn. 507, 512, 254 A.2d 872; and we have further stated that a party gains nothing by his general exception to the entire charge. *Albrecht* v. *Rubinstein,* 135 Conn. 243, 246, 63 A.2d 158; *Syms* v. *Harmon,* 134 Conn. 653, 657, 60 A.2d 166; *Ladd* v. *Burdge,* 132 Conn. 296, 297, 43 A.2d 752; *Lebas* v. *Patriotic Assurance Co.,* 106 Conn. 119, 122, 137 A. 241. Exceptions to these rules, however, have been made in capital cases in the interests of due process; *State* v. *Reid,* 146 Conn. 227, 149 A.2d 698; *State* v. *Walters,* 145 Conn. 60, 65, 138 A.2d 786, cert. denied, 358 U.S. 46, 79 S. Ct. 70, 3 L. Ed. 2d 45; or where the error claimed is of federal constitutional dimensions. *O'Connor* v. *Ohio,* 385 U.S. 92, 87 S. Ct. 252, 17 L. Ed. 2d 189; *State* v. *Vars,* 154

Conn. 255, 271–72, 224 A.2d 744. The purpose of the rule is to alert the court to claims of error while there is still an opportunity for correction in order to avoid the economic waste and increased court congestion caused by unnecessary retrials. *Prystash* v. *Best Medium Publishing Co.,* supra, 512; *Towhill* v. *Kane,* 147 Conn. 191, 193, 158 A.2d 251. Our language in *State* v. *Vars,* supra, 271–72, commenting upon *O'Connor* v. *Ohio,* supra, suggests the application here of the rule followed in *Prystash* that an exception must fairly apprise the trial court of the error claimed to afford the court the opportunity to correct it. Although counsel here did not strictly adhere to the procedure required by Practice Book § 249 to "state distinctly the matter objected to," he did specify among the several claims made in his final exception that the court's instruction on manslaughter was erroneous on the grounds that it did not accurately state the law with respect to that offense. Thus, it cannot be said that no indication of the error claimed was given to the trial court when we view the exception to the charge on manslaughter combined with the specific exception to the instruction relating to § 53-203, on discharge of a firearm within the city limits. The court's response to the detailed exception to the charge on § 53-203 and the victim's death, and the notation of the broader second exception, demonstrate that the court did not intend to reinstruct on manslaughter or redefine the elements of that offense.

The defendant contends that the court's charge on the elements of the crime of manslaughter constituted an attempt to invoke the so-called misdemeanor-manslaughter rule, an attempt, it is further claimed, that was inadequate and failed to state completely the elements of that doctrine. The doctrine is a

reduced analogue of the felony-murder rule and although we have at various times recognized the felony-murder rule; General Statutes § 53a-54c; *State* v. *Rossi,* 132 Conn. 39, 44, 42 A.2d 354; we have never specifically recognized the misdemeanor counterpart, although it exists in a number of jurisdictions. See LaFave & Scott, Criminal Law, pp. 594–602. The analysis under the misdemeanor-manslaughter rule varies with the nature of the misdemeanor or unlawful act. Basically, it must be determined initially whether the unlawful act falls in the category of acts mala in se or mala prohibita, different elements arising depending upon the classification. LaFave & Scott, op. cit. 597–600.

If the unlawful act or misdemeanor is within the class of acts mala in se, then the analysis echoes the felony-murder concept. If, however, the unlawful act is merely malum prohibitum, it is not enough that death occur during commission of the act, as the court's charge implied, but it is further required that the prohibited conduct be found to have been the proximate cause of the death; see *Potter* v. *State,* 162 Ind. 213, 70 N.E. 129; *State* v. *Budge,* 126 Me. 223, 137 A. 244; *Commonwealth* v. *Williams,* 133 Pa. Super. 104, 1 A.2d 812; *Holder* v. *State,* 152 Tenn. 390, 277 S.W. 900; and generally, 40 Am. Jur. 2d, Homicide, § 75; or that one of three situations described by LaFave & Scott be found to exist: (1) death is a foreseeable and natural consequence of the unlawful act; (2) death is caused by the defendant's conduct's unlawful excess, or (3) his acts amount to criminal negligence. LaFave & Scott, op. cit. 597–600. The court's charge took the jury to the point where the distinction between acts mala in se and mala prohibita should have been made if this doctrine were to be correctly applied,

but it went no further, turning instead to a discussion of the medical testimony that revealed that death resulted from the bullet wound. Under this doctrine, if the unlawful act under § 53-203 is merely malum prohibitum it is not enough that death result from the fact of the entry of the bullet. The wounding is a result of the conduct upon which this analysis should focus. The violation of the statute must be shown to be the proximate cause of death and we must therefore look at that evil which the statute was intended to proscribe. Here the statute did not proscribe discharging a firearm within city limits, as does its successor, Public Act 73-457, but merely proscribed such discharge without a permit from the mayor. The unlawful act, then, is having no permit to discharge a firearm, not the discharge per se. Had the defendant obtained a permit, and assuming he fired the fatal shot as alleged, the discharge of the firearm would not be an unlawful act and since it cannot reasonably be said that failure to obtain a permit was the proximate cause of death, the doctrine cannot apply. It is the firing of the weapon that would have to be proved to be an unlawful act. Testing the charge by the claims of proof as they appear in the finding; Practice Book § 635; *State v. Brown,* 163 Conn. 52, 58, 301 A.2d 547; no attempt to prove an unlawful act other than the violation of the statute was made by the state. The misdemeanor-manslaughter rule is thus totally inapplicable. Therefore, even if the court had completed the analysis, the doctrine could not serve as a basis for conviction under this prohibitory statute, General Statutes § 53-203. The jury were simply told that if they found that the defendant discharged a firearm in violation of § 53-203 and that death resulted from the bullet wound this is manslaughter.

We cannot approve of this instruction. Nor can this be cured by the remainder of the court's charge on the crime of manslaughter. No adequate distinction between voluntary and involuntary manslaughter was given and contradictory statements as to intent and its role in this case were made by the court. The charge on this issue failed accurately to state the elements of the offense charged and did not fairly present the case to the jury. *State* v. *Edwards,* 163 Conn. 527, 537, 316 A.2d 387.

The state argues that Connecticut does not recognize the misdemeanor-manslaughter doctrine. The question appears to be left open by the only case that has approached this analysis. In *State* v. *DiLorenzo,* 138 Conn. 281, 83 A.2d 479, the permit statute under consideration involved operating a still without a permit and we held that the court (the case having been tried to the court and not to a jury) could consider the entire body of evidence in deciding the question of guilt and was not limited to a consideration of whether the violation of that permit statute was of such a nature that the resulting deaths could be labeled manslaughter, stating as follows (p. 284): "The defendant has overlooked the breadth of the allegation of unlawfulness. The information referred to no specific statute; it made no mention of the word 'permit'; and it cannot be construed as limiting proof of unlawfulness to the failure to obtain a permit. The allegation was far more comprehensive than the defendant appears to realize. The act was described as 'the unlawful installation and operation of a still.' This was broad enough to allow proof of any unlawful act performed in connection with the installation and operation, whether it consisted of the violation of the statute

requiring the defendant to get a permit before engaging in his proposed venture or the mode or manner in which the still was constructed or operated."

Although the record here does not reflect a bill of particulars requested by the defendant, neither does the record reveal, as in *DiLorenzo,* any "evidence calculated to establish, in addition to a violation of the permit statute, acts of recklessness [as there] in the construction and operation of the still." *State v. DiLorenzo,* supra, 285. The state contends that the jury could have considered the gross and wanton act of a person who fires a weapon at a residence and that the statutory violation was not the sole act of unlawfulness. The state would have done well to request that the court so instruct the jury. The court, however, stated: "Now, in this particular case, it is claimed that the unlawful act which was committed is a violation of a section of our statutes 53-203, which provides that no one may discharge a firearm within the limits of any city without the permission of the Mayor. That's the statute. It makes it a criminal act to do that. And if you were to find that the defendant discharged any firearm within the limits of the City of Bridgeport in this particular case, you would have to limit yourself to the back yard at 554 and 564 Arctic Street. If he discharged the firearm there, and if you believe that he had no permission to fire it from the Mayor, and there is testimony to the effect that the search of the records indicated that no such permission was given, that in itself would be unlawful, it would be an unlawful act which would be involved in manslaughter." The jury may well have considered the act of firing the gun, aside from the statute, as an unlawful act, but the court's charge did not so define the manslaughter analysis and thus was erroneous.

We therefore specifically recognize the validity of the tort theory of manslaughter, sometimes referred to as the misdemeanor-manslaughter doctrine, insofar as it might apply to offenses committed prior to the enactment of §§ 53a-55 and 53a-56.

The defendant has assigned error in the court's denial of his motion to set aside the verdict. This claim is tested by the evidence printed in the appendices to the briefs. *Fleming* v. *Becker,* 162 Conn. 563, 565, 295 A.2d 524; *Smith* v. *Housing Authority,* 144 Conn. 13, 14, 127 A.2d 45. It cannot be said upon all the facts that the evidence was insufficient to support the verdict; rather, it presented factual conflicts for the trier to resolve. Had the jury been properly instructed, it cannot be speculated as to what result they may have reached.

There is error, the judgment is set aside and a new trial is ordered.

In this opinion the other judges concurred.