## STATE OF CONNECTICUT *v.* ANTHONY JUST

BOGDANSKI, C. J., PETERS, HEALEY, PARSKEY and ARMENTANO, Js.

Argued June 2—decision released August 18, 1981

*John R. Williams,* for the appellant (defendant).
*Donald A. Browne,* state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. Upon trial to a jury, the defendant was found guilty of three counts of kidnapping in the first degree, each in violation of General Statutes § 53a-92 (a) (2) (B).[1] From the judgment rendered on the verdict, he appeals and asserts six claims of error.

From the evidence presented at trial, the jury could reasonably have found the following facts: In Shelton, on the evening of March 1, 1975, plant No. 4 of the Grand Sheet Metal Company, popularly known as the Sponge Rubber Factory,[2] was destroyed by an incendiary explosion and fire

---

[1] General Statutes § 53a-92 (a) (2) (B) provides: "(a) A person is guilty of kidnapping in the first degree when he abducts another person and when: . . . (2) he restrains the person abducted with intent to . . . (B) accomplish or advance the commission of a felony."

[2] The Sponge Rubber Products Company was a subsidiary of the Grand Sheet Metal Company. Plant No. 4 consisted of more than 24 buildings joined together to make up a plant roughly 1200 feet long by 300 feet wide, with heights ranging from one to four stories.

of major proportion.[3] Federal and state investigation led to the determination that the plant had been destroyed by a deliberately set fire, initiated by an explosive device with an accelerant and detonating cord used to spread the fire.

The evidence disclosed that during the days immediately preceding March 1, 1975, three individuals named John Shaw, Dennis Tiche and Michael Tiche accumulated a large quantity of gasoline, dynamite and detonating cord which they loaded onto an Avis rental truck in Pennsylvania on February 27. This truck was driven to Shelton, Connecticut by another individual named Donald Connors. John Shaw, Dennis Tiche and Michael Tiche flew from Pittsburgh to New York and then traveled to Connecticut.

On the evening of February 27, in Pennsylvania, the defendant met with Albert Coffey and Ronald Betres; the three proceeded to drive from Pennsylvania to Danbury, Connecticut in Betres' Buick automobile. In Danbury, the three men registered in a Holiday Inn, where they were observed and subsequently identified by numerous hotel employees, and where the fingerprints of the defendant and Ronald Betres were later located in room 118, where the men stayed on the evening of February 28.

On the morning of Saturday, March 1, 1975, the defendant and Ronald Betres drove to a Howard Johnson's restaurant in Derby where they met John Shaw, Dennis Tiche and Michael Tiche and another individual named David Bubar, who apparently had access to the Sponge Rubber Company plants.

[3] It took between one and one and one-half weeks to extinguish the fire completely.

On that particular occasion, Bubar transported John Shaw, Dennis Tiche and Michael Tiche to plant No. 4, and the defendant and Betres returned to the Holiday Inn in Danbury. In the early evening of the same date the defendant, Ronald Betres and Albert Coffey returned again to the Howard Johnson's in Derby and met again with David Bubar. At that time, Betres had a loaded pistol and three sets of handcuffs in his possession. During the same evening of March 1, John Shaw, Dennis Tiche and Michael Tiche proceeded to distribute gasoline and dynamite throughout the plant and to connect the various items distributed by detonating cord.

Two company security guards, Roy Ranno and Alfred Hanley, and a company boilerman, Robert DeJoy, were working inside the plant that night. At approximately 10 p.m., three masked[4] individuals, later identified as the defendant, Albert Coffey and Ronald Betres, confronted the security guards, with Betres showing his pistol. At gunpoint, the two men were removed down a flight of stairs to a ladies rest room on the bottom floor of the plant, where their hands were handcuffed and their eyes were covered with tape.

The two guards, after their capture, informed their three abductors that there was another individual working in the boiler room. The defendant and Ronald Betres proceeded to that room where they captured DeJoy at gunpoint and removed him to the ladies rest room where the other two men were being held.

Subsequently, the three plant employees were led out of the plant in single file and placed inside Ranno's automobile. The men were in the car for

---

[4] The men were wearing ski masks.

approximately forty-five minutes, during which time they were driven to the town of Monroe. In Monroe, the Ranno automobile was driven onto a dirt lane; the employees' handcuffs were removed and their hands were taped. The defendant and his accomplices, Betres, Coffey, Shaw, Dennis Tiche and Michael Tiche, left the location in Betres' Buick automobile and, after stopping momentarily to verify that the plant had exploded, the men drove directly to New York City where they eventually separated into two groups and returned to Pennsylvania.

## I

We take up first the defendant's claim that the court erroneously allowed the state to prove his guilt "by proving the convictions of alleged co-conspirators."[5] During the course of the trial, three of the defendant's accomplices, Albert Coffey, John Shaw and Ronald Betres, testified for the state. All three testified at some length, both on direct and on cross-examination, implicating themselves and the defendant. The present claim of error concerns the admission into evidence of the criminal convictions of these three men in the same criminal activity for which the defendant was tried below. Coffey[6] and Shaw[7] both testified about their

[5] The information charging the defendant did not charge him with the crime of conspiracy.

[6] Coffey was the first of the three accomplices to testify. On direct examination, he testified in part, and without objection as to his criminal convictions, as follows:

"Q. And, Mr. Coffey, I would ask you whether or not in 1956 you were convicted of a crime with the interstate transportation of a motor vehicle? Were you convicted of that particular crime in 1956?

A. Yes, sir.

Q. And is that the only felony conviction that you have ever had until at least the year 1975?

convictions on direct examination without objection, and both were examined at some length about their

A. Yes, it is.

* * *

Q. Mr. Coffey, were you subsequently arrested in connection with your involvement in this particular incident?

A. Yes, sir.

Q. And were you charged with both state and federal violations in connection with your involvement?

A. Yes.

Q. And did you with a number of other gentlemen stand trial in the United States District Court in New Haven during the latter part of 1975?

A. Yes.

Q. And were you in fact convicted of certain charges and there were other charges you were not convicted of?

A. Yes, sir.

Q. You were also subsequently charged in the state court with the crimes of kidnapping and arson.

A. Yes.

Q. Is that right?

A. Yes.

* * *

Q. Did you subsequently plead guilty to certain charges in the state court in connection with your participation?

A. Yes, sir.

Q. And did that occur on December 14th of 1976?

A. Yes, sir.

Q. Approximately one month ago [sic]

A. Yes.

Q. And do you know what charges you pleaded guilty to, sir?

A. I pleaded guilty to second degree kidnapping instead of first.

Q. Do you know how many counts of second degree kidnapping you pleaded to?

A. Three.

Q. And do you know if you pleaded guilty to a count of aiding and abetting the commission of an arson?

A. Yes.

Q. In the first degree?

A. Yes.

Q. And in connection with your pleas of guilty and in consideration of the state reducing those charges from kidnapping in the first degree to kidnapping in the second degree, did you agree to testify in any subsequent legal proceedings that might be initiated in this court?

convictions on cross-examination.   Ronald Betres

A. Yes, I did.

Q. Is that the reason you are testifying here today?

A. Some of it.

Q. Are there any other reasons?   You can tell us.

A. Yes, sir.

Q. What is it?

A. Well, I just want to clear my conscience and get it over with, tell the truth about it. . . ."

[7] John Shaw was the last of the three accomplices to testify. On direct examination he testified in part, and without objection as to his criminal convictions, as follows:

"Q. Mr. Shaw, are you presently residing at that address in Harrisburg, Pennsylvania that you gave the Clerk?

A. No, I'm not.

Q. And where are you at the present time?

A. I am in the custody of the Attorney General of the United States.

Q. In fact, are you serving a sentence in the Federal penitentiary?

A. Yes.

* * *

Q. Now, were you, Mr. Shaw, subsequently arrested by representatives of the Federal Bureau of Investigation?

A. Yes, sir.

Q. And do you know approximately what date it was that you were arrested?

A. Yes.

Q. When was that?

A. It was in the end of April.

Q. And had you prior to your actual arrest been interviewed by representatives of the Federal Bureau of Investigation?

A. Yes.

* * *

Q. Did you subsequently go to the Federal Bureau of Investigation headquarters in Pittsburgh?

A. Yes.

Q. And did you subsequently admit to the representatives of the Federal Bureau of Investigation your participation in this incident?

A. Yes.

Q. And did you subsequently give them a full written confession?

MR. GOLDBERGER:   I am going to object to that. He can ask him what he did, not tell him what he did.  It is leading.

MR. BROWNE:   I am not telling him.

THE COURT:   Rephrase the question.

Q. What ultimately occurred between yourself and the members of the F.B.I., Mr. Shaw?

testified[8] on direct examination without objection about his conviction in the federal and state courts of certain crimes in connection with this incident; defense counsel did tender an objection to what

A. I talked with Mr. Dorsey, who I learned was the U.S. Attorney in New Haven, Connecticut. And after that, I gave a complete statement to the members of the Federal Bureau of Investigation.

\* \* \*

Q. Were you subsequently indicted by a Federal Grand Jury?

A. Yes.

Q. Did you enter a plea of guilty to certain charges pursuant to that indictment?

A. Yes.

Q. And whether or not, Mr. Shaw, you testified for the Government in certain proceedings in the United States District Court in the latter part of 1975 in connection with this incident?

A. Yes, sir. . . ."

[8] Ronald Betres was the second of the accomplices to testify. He testified on direct examination, in part, as follows:

"Q. There came a time, Mr. Betres, when you were arrested and charged with both state and federal violations, criminal violations, of your involvement in this incident. Is that not correct?

A. That is correct.

\* \* \*

Q. I think you have already indicated, Mr. Betres, that there came a time when you were arrested and charged with both federal and state violations.

A. Yes.

Q. Were you convicted in the Federal Court of certain crimes in connection with this incident?

A. I was.

Q. And do you know what those crimes technically are called?

A. Yes, I believe so.

Q. And what would they be?

A. Interstate travel and conspiracy.

Q. Did you on January 4th of this year enter certain pleas of guilty to certain crimes here in this courtroom?

A. I did.

Q. And do you know what those crimes were?

A. Yes, I do.

Q. And could you tell us what they were?

A. I pleaded guilty —

MR. GOLDBERGER: I am going to object to that.

THE COURT: Overruled.

Q. What were they?

Ronald Betres pleaded in the state court.[9] No cautionary instruction was given at the time these witnesses so testified; none was requested.

In *State* v. *Pikul,* 150 Conn. 195, 198, 187 A.2d 442 (1962),[10] we said: "The fact that one or more persons jointly charged with the commission of a

A. I pleaded guilty to three counts of arson — or one count of arson in the aiding and abetting arson in the first degree and three counts of kidnapping in the second degree. . . .

MR. BROWNE: If your Honor please, I have two additional questions which I would intend to put to Mr. Betres that I neglected to before. I think Mr. Goldberger has no objection to my doing that at this time.

THE COURT: You may proceed.

Q. Mr. Betres, whether or not you were convicted of the crime of burglary, four counts of burglary, in Butler, Pennsylvania in 1963?

A. I was.

Q. And were you also convicted —

THE COURT: Just a minute, please. Wait until I get my folder. Start again.

Q. Mr. Betres, whether or not you were convicted of fourt [sic] counts of burglary in Butler, Pennsylvania in 1963?

A. I was.

Q. And you were also convicted, I think you have already indicated, in the Federal Court in 1975 of two charges in connection with this incident.

A. Yes.

Q. What were those charges?

A. In Federal Court?

Q. Yes.

A. Conspiracy and interstate travel.

Q. And that would be in connection with this incident that you are testifying about today.

A. It is.

Q. Thank you. . . ."

[9] The basis for the objection was not stated and no exception was taken to the overruling of the objection.

[10] In *State* v. *Pikul,* 150 Conn. 195, 198, 187 A.2d 442 (1962), the defendant, and his co-defendants, were convicted of the charge of conspiracy to obtain money by false pretenses. The co-defendants, after pleading guilty to the same charge, testified at the defendant's trial that they each had so pleaded.

crime pleaded guilty is not admissible on the trial of another person so charged, to establish that the crime was committed. *State* v. *Gargano,* 99 Conn. 103, 107, 121 A. 657 [1923]; *United States* v. *Toner,* 173 F.2d 140, 142 (3d Cir. [1949]); 2 Wharton, Criminal Evidence (12th Ed.) § 439. This is so because a plea of guilty is, in effect, merely a confession of guilt which, having been made by one of those charged with the crime, can be no more than hearsay as to another who is so charged. *State* v. *Gargano,* supra, 108." After we decided *Pikul,* we had occasion to point out that *Pikul* "stands for the principle that the guilty plea of one or more persons jointly charged with a crime cannot be admitted in the trial of another so charged 'to establish that the crime was committed.' . . . ." (Citations omitted.) *State* v. *DellaCamera,* 166 Conn. 557, 565, 353 A.2d 750 (1974); see, e.g., *United States* v. *Harrell,* 436 F.2d 606, 614–16 (5th Cir. 1970), cert. denied, 409 U.S. 846, 93 S. Ct. 49, 34 L. Ed. 2d 86 (1972); *United States* v. *Toner,* supra, 142. While such evidence may be offered to affect credibility; see *State* v. *Pikul,* supra, 199; or for some permitted limited purpose, we believe a proper cautionary instruction to the jury should be given, generally upon objection overruled or sua sponte where the court views the potential for prejudice as likely.[11]

The lack of a curative instruction, especially in the absence of objection and a request for one, does

---

[11] When a guilty plea of a co-defendant is brought to the attention of the jury without any guiding instructions as to its use in their deliberations, its potential for misuse is apparent. See, e.g., *United States* v. *Harrell,* 436 F.2d 606, 614 (5th Cir. 1970), cert. denied, 409 U.S. 846, 93 S. Ct. 49, 34 L. Ed. 2d 86 (1972) (limited to its facts by *United States* v. *Franicevich,* 465 F.2d 467 [5th Cir. 1972]); *State* v. *Underwood,* 248 Iowa 443, 447–48, 80 N.W.2d 730 (1957).

not necessarily constitute harmful error. Our focus on review is fairness, and a curative instruction is just one factor in determining whether substantial rights of a defendant have been unfairly prejudiced. See *United States* v. *King,* 505 F.2d 602, 607 (5th Cir. 1974); see also *United States* v. *DeLucca,* 630 F.2d 294, 298 (5th Cir. 1980), cert. denied, 450 U.S. 983, 101 S. Ct. 1520, 67 L. Ed. 2d 819 (1981). We must, therefore, examine the facts and circumstances of this case in their proper context.[12]

Each of the three accomplices testified at length. It was only at the end of their direct testimony and after each had implicated himself and the defendant that testimony was elicited about their convictions concerning the criminal activity involving themselves and the defendant. This evidence, quite apart from that of their guilty pleas, was properly received—its breadth and detail probative of the defendant's guilt. See *State* v. *Riddall,* 251 Or. 506, 446 P.2d 517 (1968). The purpose of the witness' testimony "was to give the facts and circumstances of the crime[s]. The testimony as to their pleas of guilty gave the circumstances under which they were testifying, and their status with regard to the charge, and went to their credibility as witnesses for the state." *State* v. *Cole,* 252 Or. 146, 155, 448 P.2d 523 (1968). Any prejudice resulting from the testimony of the pleas was rendered harmless when the guilt of the accomplices was established by their own testimony which also implicated the defendant. See *State* v. *Riddall,* supra.

Another factor militating against finding harmful error in this case is the lack of any claim by the

---

[12] Although no proper objection to the testimony was taken, we review this claim of error in the interests of justice. See *State* v. *Cannon,* 185 Conn. 260, 266n, 440 A.2d 927 (1981).

defendant that the evidence of the witnesses' guilty pleas was ever again brought to the attention of the jury by the state in a prejudicial fashion. There is no claim that the testimony of the pleas was either emphasized by the state, or argued by the state during final argument. See *United States* v. *Rothman*, 463 F.2d 488, 490 (2d Cir.), cert. denied, 409 U.S. 956, 93 S. Ct. 291, 34 L. Ed. 2d 231 (1972); *State* v. *Cole,* supra, 155; cf. *Bisaccia* v. *Attorney General,* 623 F.2d 307, 308–309 (3d Cir.), cert. denied, 449 U.S. 1042, 101 S. Ct. 622, 66 L. Ed. 2d 504 (1980).

We also note that although the court did not give a curative instruction, the court, in its charge to the jury, instructed the jury on the care with which they were to scrutinize the testimony of accomplices, mindful of the fact that "in their own testimony . . . [each accomplice] participated in the crimes charged against the accused Anthony Just."[13]

[13] The court charged: "Now, on their own testimony, certain State witnesses — Albert Coffey, Ronald Betres and John Shaw — participated in the crimes which are charged against the accused Anthony Just. Now, they are known as accomplices. Under our law, it is not absolutely necessary that the testimony of an accomplice be corroborated before it is accepted as true by you, the jury. But in weighing the testimony of an accomplice, you must bear in mind that he is a self-confessed criminal and, everything else being equal, you would not believe the testimony of a man who has committed a felonious crime as readily as you would of a man of good character. Also, when you are listening to the testimony of a self-confessed accomplice who has not yet been sentenced, you are entitled to bear in mind the point that he may in his own mind be looking for or hoping for some favors in the disposition of his own case and, therefore, he may have an interest in the outcome of the trial, so that his testimony may have been colored by that.

"For these reasons, you as the jury must look with particular care to the testimony of an accomplice. However, you must also remember that his testimony may have been motivated by a desire to tell the truth, and that such testimony is worthy of acceptance by you, even though some hope or expectation of leniency has been offered to him by the State in exchange for his testimony. It is

These instructions, as well as the instructions on the credibility of one previously convicted of a crime,[14] and on the defendant's presumption of innocence,[15] also work against finding harmful error.

Finally, we note that the defendant's trial counsel did not take specific objection to the challenged testimony. Whether the lack of an objection or a request for a curative instruction is a matter of trial strategy is frequently not easy of determination. See *United States* v. *King*, supra, 608; cf. *State* v. *McDaniel*, 176 Conn. 131, 134–35, 405 A.2d 68 (1978). This is especially so here where defense counsel was particularly searching in his cross-examination of the three accomplices, as well as with other witnesses, and made many objections and took a number of exceptions to the examination of witnesses. We note here the words of the United States Court of Appeals for the Fifth Cir-

for you in the exercise of your own sound judgment and discretion to determine what weight, if any, you will give to the testimony of an accomplice."

[14] The court instructed: "Now, you will also recall that during the course of this trial, Albert Coffey, Ronald Betres and John Shaw testified that they had previously been convicted of crimes either related or unrelated to the alleged crimes in question. We have a statute in Connecticut which provides that no person shall be disqualified as a witness because of a conviction of crime, but that such conviction may be shown to affect the credibility of the testimony which a convicted person has given. The fact that a witness was convicted of a crime does not disqualify him as a witness and he should not be considered by you in that light. The fact of a conviction of other crimes is one of the factors for you to take into consideration along with the other material facts in determining the credibility which you will afford to that particular witness."

[15] During these instructions the court said: "The accused Anthony Just does not have to prove that he did not commit the offense or offenses with which he stands charged. The State of Connecticut must prove that he did. And to prove that, the State of Connecticut must prove each and every essential element going to make up the offense charged."

cuit which, in discussing whether the failure to object to such testimony could have been the result of tactical considerations, stated, in *United States* v. *King,* supra, that "[o]ne legitimate defense consideration might be a concern that the remedy could be more injurious than the malady—that is, that a corrective instruction might call more attention to a witness' guilty plea than the witness' admission." Id., 608 n.12.

Thus, although we strongly approve of the giving of a curative instruction, in the circumstances of this case we hold that the failure of the trial court to give such an instruction does not amount to harmful error.

## II

The defendant's second claim of error involves the court's charge to the jury on the issue of reasonable doubt and its statement, within the course of its charge, that "the law is not made to protect guilty persons." With regard to this argument, the defendant contends that by charging the jury in negative terms regarding reasonable doubt, and by stating that a reasonable doubt standard is one which requires "a good, honest, sound, conscientious reason," the court diluted, to an unconstitutional degree, the reasonable doubt standard.

We initially note that although the defendant now assigns error to the court's charge, no exceptions to the court's charge were taken by trial counsel and no pertinent request to charge was made. In such situations, this court has refused to consider claimed errors in the trial court's instruction. See *State* v. *Parham,* 174 Conn. 500, 509, 391 A.2d 148 (1978); *State* v. *Gerak,* 169 Conn. 309, 316, 363 A.2d 114 (1975). We note, however, that even if this issue

had been properly raised, under the reasoning set out by this court in *State* v. *Cari,* 163 Conn. 174, 180, 303 A.2d 7 (1972), and *State* v. *Guthridge,* 164 Conn. 145, 154, 318 A.2d 87 (1972), cert. denied, 410 U.S. 988, 93 S. Ct. 1519, 36 L. Ed. 2d 186 (1973), considering the charge as a whole, we would find no error. See also *State* v. *Jonas,* 169 Conn. 566, 578, 363 A.2d 1378 (1975), cert. denied, 424 U.S. 923, 96 S. Ct. 1132, 47 L. Ed. 2d 331 (1976). "[T]he charge as given was proper and correct since it was used in conjunction with clear instruction both as to the presumption of innocence and as to the duty of the state to prove beyond a reasonable doubt the defendant's guilt of the crimes with which he is charged. *State* v. *Colonese,* 108 Conn. 454, 459, 143 A. 561 [1928]." *State* v. *Cari,* supra, 181.[16]

---

[16] The challenged portion of the charge in *State* v. *Cari,* 163 Conn. 174, 180, 303 A.2d 7 (1972), was as follows: "Now, it is the sworn duty of Courts and jurors to safeguard the rights of persons charged with crime by respecting the presumption of innocence which the law imputes to every person so charged. But the law is made to protect society and innocent persons and not to protect guilty ones. If this presumption of innocence has been overcome or removed by evidence clearly demonstrating beyond a reasonable doubt that the accused person is guilty of the crime charged, then it is the sworn duty of the jury to enforce the law which is made for the protection of life, society and property and to render such a verdict as the evidence warrants."

The instruction objected to in *State* v. *Guthridge,* 164 Conn. 145, 318 A.2d 87 (1972), cert. denied, 410 U.S. 988, 93 S. Ct. 1519, 36 L. Ed. 2d 186 (1973), which we upheld after considering the charge as a whole, read as follows: "It is the sworn duty of courts and jurors to safeguard the rights of persons charged with crime by proving guilt of an accused beyond a reasonable doubt before finding the accused guilty. But the law is made for the protection of society and innocent persons and not to protect guilty ones. If and when that presumption of innocence has been overcome and removed by proving beyond a reasonable doubt an accused person is guilty of a crime charged then it is the sworn duty of the jury to enforce the law which is made for the protection of life, society and property and to render such a verdict as the evidence warrants." Id., 154 n.5.

## III

The defendant's third claim is that, with respect to his convictions of kidnapping in the first degree, in violation of General Statutes § 53a-92 (a) (2) (B), the evidence did not establish his guilt beyond a reasonable doubt. He specifically claims that the state "totally failed to prove . . . that the abductions in any way were done for the purpose of accomplishing the arson or advancing it." He argues: "Indeed, the evidence showed without contradiction that the abductions were a humanitarian gesture designed to protect the three 'victims' from the consequences of the arson."

We have repeatedly stated the test which this court employs to determine whether the evidence is sufficient to sustain a verdict: " '[T]he issue is whether the jury could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt . . . .' " *State* v. *Gaynor,* 182 Conn. 501, 503, 438 A.2d 749 (1980), quoting *State* v. *Festo,* 181 Conn. 254, 259, 435 A.2d 38 (1980); *State* v. *Nemeth,* 182 Conn. 403, 410, 438 A.2d 120 (1980); *State* v. *Saracino,* 178 Conn. 416, 419, 423 A.2d 102 (1979); *State* v. *Jackson,* 176 Conn. 257, 262, 407 A.2d 948 (1978). "In ruling on such a motion, the evidence presented at the trial must be given a construction most favorable to sustaining the jury's verdict." *State* v. *Jackson,* supra, 262; see *State* v. *Nemeth,* supra; *State* v. *Chetcuti,* 173 Conn. 165, 172, 377 A.2d 263 (1977). Each essential element of the crime charged must be established by proof beyond a reasonable doubt,

" 'and although it is within the province of the jury to draw reasonable, logical inferences from the facts proven, they may not resort to speculation and conjecture.' " *State* v. *Gaynor,* supra; *State* v. *Festo,* supra; see *State* v. *Stankowski,* 184 Conn. 121, 126, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981).

We have also stated: "Intent is a mental process which ordinarily can be proven only by circumstantial evidence." *State* v. *Zdanis,* 182 Conn. 388, 396, 438 A.2d 696 (1980), cert. denied, 450 U.S. 1003, 101 S. Ct. 1715, 68 L. Ed. 2d 207 (1981). "The intent of the actor is a question for the trier of fact, and the conclusion drawn by the trier in this regard should stand unless it is an unreasonable one." *State* v. *Holley,* 174 Conn. 22, 26, 381 A.2d 539 (1977).

Upon review, we conclude that the evidence, as set forth above, was sufficient to establish the defendant's guilt beyond a reasonable doubt.[17] Although the defendant may have had a "humanitarian" motive in abducting the three employees, this does not preclude a finding that the abductions were done for the purpose of accomplishing or advancing the commission of the arson.

---

[17] We note, for example, the testimony of Robert DeJoy on direct examination. DeJoy was asked the following questions and gave the following answers concerning his being confronted by the defendant and Betres:

"Q. Could you tell us approximately how long after Hanley left that something happened?

A. 20 minutes to a half hour.

Q. And what was it that happened?

A. Two masked heavy-set men came around at me, one with a pistol, and took me in their custody, telling me that they were going to blow up the shop and they were going to take me out."

## IV

The defendant's next contention is that the court erroneously instructed the jury concerning unlawful restraint in the first degree as a lesser included offense of the crime of kidnapping in the first degree. His argument is not that he has been convicted of an offense for which he was never given notice. See *State* v. *Rodriguez,* 180 Conn. 382, 402, 429 A.2d 919 (1980). He cannot make this argument since he was not convicted of unlawful restraint in the first degree; rather he was convicted of the greater offense of kidnapping in the first degree. His claim is as follows: "By improperly inflating the list of supposed lesser included offenses, the court totally confused the real and only issue in the case regarding lesser included offenses—whether Mr. Just was guilty as charged or guilty of the lesser offense of kidnapping in the second degree. Every practicing lawyer knows the numbing effect upon even a trained mind of listing the supposed distinctions among a long list of lesser included offense."

Even assuming that this claim is properly before us, [18] we do not find harmful error. Any error would be harmless. The defendant was not found guilty of unlawful restraint, but rather of the greater offense of kidnapping in the first degree. The court repeatedly charged the jury that they were not to consider the lesser offenses of kidnapping in the first degree if they found the defendant guilty of

---

[18] No objection was made to the charge, and this case is unlike *State* v. *Rodriguez,* 180 Conn. 382, 429 A.2d 919 (1980), where the defendant was convicted of the allegedly erroneously given charge.

that crime.[19]  The jury is to "be presumed, in the absence of a fair indication to the contrary, to have followed the instructions of the court as to the law. *State* v. *Smith,* [156 Conn. 378, 383, 242 A.2d 763 (1968)]. There is nothing to indicate that the jury failed to follow the instructions of the court, and the defendant's claim of prejudice finds no support in the record." *State* v. *Bausman,* 162 Conn. 308, 314, 294 A.2d 312 (1972); see *State* v. *Barber,* 173

---

[19] After charging the jury on the elements of kidnapping in the first degree, the court instructed: "Now, if you decide that the evidence before you is insufficient to support the charges of kidnapping in the first degree beyond a reasonable doubt or that the State has failed to prove each and every essential element of the crimes charged against the defendant Anthony Just beyond a reasonable doubt, you must then consider whether or not the evidence produced is sufficient to establish beyond a reasonable doubt that the defendant Anthony Just is guilty of the lesser included offenses of kidnapping in the second degree or unlawful restraint in the first degree or unlawful restraint in the second degree."

The court later stated: "As I said before, you will consider the lesser included charges if and only if you find the defendant Anthony Just not guilty of the crimes of kidnapping in the first degree. If you do find him guilty of that offense, that is, kidnapping in the first degree, you will have no need to consider the lesser included offenses. And in that event, you will disregard what I have said and will say with respect to them, that is, the lesser included offenses.

"On the other hand, if you determine that Anthony Just is not guilty of the crime of kidnapping in the first degree, you must then decide whether or not he is guilty or not guilty of the lesser included offenses of kidnapping in the second degree or unlawful restraint in the first degree or unlawful restraint in the second degree. You are to understand, members of the jury, that this is not a direction to you to find that the accused committed a lesser offense, if you do not find him guilty of kidnapping in the first degree. But it is only an explanation that, if the greater crimes, that is, the more serious crimes of kidnapping in the first degree, are not proven by the State beyond a reasonable doubt against the accused Anthony Just, then you may consider the next lesser crime in degree. And if that crime is not proven beyond a reasonable doubt, then you will consider the next lesser included crime in degree, and so on. If after you have considered all of these lesser included crimes on

Conn. 153, 156–57, 376 A.2d 1108 (1977). Thus, even if the charge were erroneous, any claimed error was harmless.

## V

The defendant next argues that the court's refusal to conduct a hearing, under *Franks* v. *Delaware,* 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), on the truthfulness of factual allegations made in the affidavit supporting the warrant leading to his arrest denied him due process of law. The arrest warrant in this case was based upon the joint affidavit of officers Robert Geoghan and Nicholas Valerio of the Connecticut state police. In the lengthy affidavit, the police officers detailed the information given to them by an informant named James Shaw. The defendant attacks that portion of the affidavit which asserts that Shaw was shown several photographs and identified one photograph as that of the defendant. The defendant, in his brief, claims that "[t]hat assertion was false," and points to a sworn affidavit to support his claim that the warrant was intentionally untruthful. He further maintains that without this assertion, "there was no probable cause for the arrest warrant in this case."

which I shall instruct you in a moment, you find that none of them are proven beyond a reasonable doubt, then, of course, your verdict will be not guilty."

After the court charged the jury on the elements of the crime of kidnapping in the second degree, it stated: "Now, if you find that the defendant Anthony Just is guilty of the crimes of kidnapping in the first degree, you need not consider the lesser included offenses of kidnapping in the second degree. If you find him not guilty of kidnapping in the first degree, then you must consider the lesser included offenses of kidnapping in the second degree. Only if you find him not guilty of kidnapping in the second degree will you then consider the next lesser included offenses of unlawful restraint in the first degree."

The trial court, on the basis of our holding in *State* v. *Williams,* 169 Conn. 322, 329, 363 A.2d 72 (1975),[20] did not grant the defendant's request for a hearing. Subsequent to that decision, the United States Supreme Court handed down *Franks* v. *Delaware,* supra, which discussed the issue of when a defendant can attack the veracity of a warrant affidavit after the warrant has been issued and executed. In *Franks,* the court held that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." Id., 155–56.[21] Although we are not con-

[20] In *State* v. *Williams,* 169 Conn. 322, 329, 363 A.2d 72 (1975), we stated the following: "The attempt to contradict the information of the police officer contained in the affidavit was essentially an attempt to litigate a defense of alibi before trial. Alibi evidence is merely a rebuttal of the state's evidence. . . . At a plenary trial such an issue becomes one of credibility to be determined upon the whole evidence. . . . The court did not commit error in refusing to allow a full evidentiary hearing on the truthfulness of the affidavit supporting the search warrant."

[21] The court, near the end of its opinion, elaborated on this holding: "There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false, and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental

vinced that the defendant has met the first prong of this test, we need not decide the issue since we hold that even in the absence of the attacked assertion, there was probable cause to support the issuance of the warrant.

We have recently stated that probable cause to arrest exists if: "(1) there is probable cause to believe a crime has been committed; and (2) there is probable cause to believe that the person to be arrested committed that crime." *State* v. *DeChamplain,* 179 Conn. 522, 529, 427 A.2d 1333 (1980). If a warrant is based on an affidavit containing statements of an informant, the affidavit must recite "(1) some of the underlying circumstances relied on by the person providing the information to the affiant; and (2) some of the underlying circumstances from which the affiant concluded (a) that the informant, whose identity need not even be disclosed, was credible, or (b) that his information was reliable." *State* v. *Jackson,* 162 Conn. 440, 446, 294 A.2d 517, cert. denied, 409 U.S. 870, 93 S. Ct. 198, 34 L. Ed. 2d 121 (1972); *State* v. *Bember,* 183 Conn. 394, 410-11, 439 A.2d 387 (1981); see *Aguilar* v. *Texas,* 378 U.S. 108, 114, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964). In examining the affidavit in the present case, and deleting the attacked portion, we find that both prongs of this test, commonly referred to as the *Aguilar* test, have been satisfied.

The first prong of the test is clearly met. "If credited, the facts supplied by the informant more

informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Franks* v. *Delaware,* 438 U.S. 154, 171-72, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).

than entitle him to believe that the defendant participated in the crimes; the informant was not only an eyewitness to the crime but also a participant." *State* v. *Jackson,* supra, 446.

The second prong has also been amply satisfied. When an affidavit contains information from an untested informant, this court has employed several methods by which to judge the information's reliability or the informant's credibility. One of the most common factors used to evaluate the reliability of an informant's information is the corroboration of the information by the police. "If the police have evidence (such as from prior independent police work), which corroborates some of the details included in the affidavit, then an inference of reliability will arise. *Spinelli* v. *United States,* 393 U.S. 410, 417–18, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969); *Draper* v. *United States,* 358 U.S. 307, 309–10, 79 S. Ct. 329, 3 L. Ed. 2d 327 (1959); *United States* v. *Canestri,* 518 F.2d 269, 272 (2d Cir. 1975); *State* v. *Jackson,* supra, 448." *State* v. *Ferguson,* 185 Conn. 104, 113, 440 A.2d 841 (1981). "The theory of corroboration is that a statement which has been shown true in some respects is reasonably likely to be true in the remaining respects." *State* v. *Jackson,* supra, 447.

We have reprinted, in a footnote to this opinion, the joint affidavit of police officers Robert Geoghan and Nicholas Valerio.[22] A review of that detailed

---

[22] "AFFIDAVIT OF ROBERT GEOGHAN & NICHOLAS VALERIO

"The below signed affiants, Sergeant Robert Geoghan and Sergeant Nicholas Valerio make the following affidavit:

"That both affiants are regular members of the Connecticut State Police Department and have a combined experience of thirty years

with said department. That both are presently assigned to the Detective Division.

"That on March 1, 1975, the Sponge Rubber Products Company, Canal Street, Shelton, Connecticut, a Division of Grand Sheet Metal Incorporated, Spencerville, Ohio, was engulfed by flames after an explosion and fire. Said explosion and fire began at approximately 11:30 P.M. and burned into the early morning hours of March 2, 1975, completely destroying the Plant #4 portion of said company. That said explosion and subsequent fire was reported to these affiants and other investigators by Shelton Fire Chief Leroy Brainard, State Police Fire Investigator, Sergeant Frederick Moffett, and other witnesses who heard the aforementioned explosion. That during the normal course of this investigation, members of the Connecticut State Police Department have regularly reported to said affiants regarding information received in said investigation and have reported the information contained herein, and the affiants have also consulted with and reviewed reports of members of the Federal Bureau of Investigation concerning such incident.

"That on March 1, 1975, prior to the fire, at approximately 10:00 PM, two security guards and a boilerman, the only three employees at Plant # 4 at the time, were kidnapped at gunpoint by three men wearing over the head ski masks. Handcuffs were placed on their wrists and their eyes were taped. They were led from the building at approximately 10:45 PM, after having been held at said Plant in the bound condition for approximately forty five minutes, placed in the rear seat of one of the guard's vehicles and driven to the Town of Monroe, Connecticut. The victims were left in the car after the perpetrators removed the handcuffs from their wrists and bound them with adhesive tape. That the area where the victims were left is approximately midway between the City of Danbury and the aforementioned Plant in Shelton. All three victims were personally interviewed by the undersigned affiants on March 2, 1975.

"That on March 6, 1975, Sergeant Frederick Moffett was interviewed by affiant Sergeant Robert Geoghan at Plant #4. Sergeant Moffett pointed out an indentation burned into the concrete on the first floor, leading past the entrance to the ladies room and to a point in the press room where there was a crater in the floor caused by an explosion. Sergeant Moffett stated that the burned indentation was caused, in his opinion, by detonating cord, used as an accelerant to detonate explosives. Sergeant Moffett further stated that he determined this by an alligator pattern left as the trail of the indentation crossed a piece of steel.

"That on March 7, 1975, Trooper Robert O'Shaughnessey of the Connecticut State Police Emergency Services Division, reported that after clearing debris at the burned out Plant, he found a trial from the detonating cord indicating that at least 5000 ft. was used.

Trooper O'Shaughnessey further reported that the remains of four paper fiber drums were found in the debris and that said drums had plastic lining inside. That a strong odor of gasoline or paint thinner was detected at said fiber drums. That the drums bore markings of the Kodak Film Company, indicating that they did not belong in the plant. That the fiber barrell remains were examined at the Federal Bureau of Investigation Laboratory in Washington, D.C., where gasoline traces were found in the plastic lining remains of the said barrels.

"That on April 11, 1975, John W. Shaw, a resident of Harrisburg, Pennsylvania, was interviewed by Special Agent James McNamara of the Federal Bureau of Investigation. The interview took place in Pittsburgh, Pennsylvania. That in a written statement obtained at that time from the said John W. Shaw, he stated that on February 18, 1975, he was contacted by one Dennis Tiche of Boyers, Pennsylvania. That he met with Dennis Tiche during the evening of February 18, 1975, and that Dennis Tiche asked him to assist him in burning a building, and that he Shaw, would receive $2,500 as payment for his assistance. John W. Shaw further stated that Dennis Tiche told him that he, Dennis Tiche, and Anthony Just of Pennsylvania, had viewed the plant and that it was extremely large and that there were tanks in the plant that were very flammable. That on February 20, 1975, he received approximately $1,000 from Dennis Tiche for expenses which would be incurred. That he then purchased 50 fifty gallon capacity fiber barrels from the Weissman Barrel Company in Braddock, Pennsylvania. John W. Shaw further stated in a detailed account, the manner in which the fifty fiber barrels were subsequently filled with gasoline and placed onto an Avis Rental truck together with a quantity of dynamite and detonating cord, and that a cousin of Dennis Tiche by the name of Michael Tiche, assisted in loading the gasoline. John W. Shaw further stated that on February 28, 1975, at approximately 12:30 AM, he and Dennis Tiche met two or three men at a gasoline station in Boyers, Pennsylvania and that these men were in a Cadillac Eldorado, color blue, with a white top and a white interior. That an individual identified to him as 'Blackie' proceeded directly to the aforementioned Avis Rental truck and drove off. That Dennis Tiche talked with an individual in the Cadillac Eldorado he later identified as, 'Pete.' John W. Shaw further stated that on February 28, 1975, at approximately 7:55 PM he, Dennis Tiche, and Michael Tiche flew from Pittsburgh to New York City and then took a train to New Haven, Connecticut. That upon arrival in New Haven, they walked to the Park Plaza Hotel and they all signed in at the hotel. That he used his correct name and that Dennis Tiche and Michael Tiche used fictitious names and addresses. That when they arrived at LaGuardia Airport in New York, the subject named, 'Pete,' appeared and had a conversation

with Dennis Tiche. That Dennis Tiche later told him that 'Pete' gave him $3,000 as partial payment and that while at the Park Plaza Hotel in New Haven, Dennis Tiche gave him $1,000. John W. Shaw further stated that on the morning of March 1, 1975, he, Dennis Tiche, and Michael Tiche took a cab to Howard Johnson's Restaurant, where they met four other men. That one of the men was Anthony Just, one was identified as 'Al,' and one as 'Ronnie.' That 'Al' was described as short and 'Ronnie' as being large, with a bald head. That the fourth man was identified as 'Dave' and was wearing a suit and trenchcoat. That 'Dave' drove he, Dennis Tiche, and Michael Tiche to the plant. That he and Dennis Tiche were wearing work belts and that 'Dave' signed all three of them into the plant and told them that their 'alibi' was that they were telephone company workmen, setting up a new telephone system. That 'Dave' also told him that he had something to do with the water treatment of the company. John W. Shaw further stated that 'Dave' took the three of them on a tour of the plant and that he, Shaw, observed fiber barrels in the plant which were similar to those loaded onto the Avis Rental truck in Pennsylvania. That 'Dave' said that he had ordered them earlier and that he was glad that the fiber barrels looked the same. That they were held up in placing the material for the fire due to the elevator in the plant being broken down. That the same Avis Rental truck that had been loaded in Pennsylvania was parked at the loading dock at the plant and that 'Blackie' was sitting in it. That after the elevator was repaired, he, Michael Tiche, and 'Blackie' unloaded the truck. That during the afternoon, 'Dave' said that he had talked to the guards at the plant and determined that they did not make any rounds of the plant until 8:00 PM. That between 5 and 7 PM they placed the barrels at random through the plant. John W. Shaw further stated that between 8:00 PM and 9:30 PM, 'Dave' showed up with 'Ronnie,' 'Al,' and 'Tony' and said that the latter three would get the guards and boilerman out of the plant while Dennis Tiche, Michael Tiche, and he, John W. Shaw, completed placing the materials for the destruction. That after they completed the work inside the plant, they set the timing device for 25 minutes and then left the area of the plant in a burgundy colored Mustang automobile belonging to one of the guards. That he was told that 'Tony' and 'Al' had already left in the other guard's car, with the two guards and the boilerman. That they drove to an area not familiar to him where they met 'Al' and 'Tony' who had the three employees. That they removed the handcuffs from the employees and threw the car keys into the bushes. John W. Shaw further stated that he knew Anthony Just, having met him previously. That while at the plant, 'Dave' told him that he had already invested over $100.000 [sic] in this and that he and 'Pete' knew each other.

"John W. Shaw was shown photographs of David Bubar, Anthony Just, and Ronald Betres. He identified David Bubar as the man named 'Dave,' mentioned previously. He identified Anthony Just as 'Tony,' mentioned previously, and he identified Ronald Betres as 'Ronnie,' mentioned previously.

"Affiant Sergeant Nicholas Valerio personally interviewed John W. Shaw and obtained the same information from him as contained in the statement given to the FBI agent as related previously in this affidavit.

"That on February 28, 1975, a man identifying himself as A. Allen Baucan, 1901 West 27th St., Cleveland, Ohio, checked into the Holiday Inn in Danbury, Connecticut. That a check with employees of the Holiday Inn, who were shown photos of Albert Coffey, 1984 West 28th St., Cleveland, Ohio, revealed that the man identifying himself as A. Allen Baucan, was in fact identified as the aforementioned Albert Coffey. That during Albert Coffey's stay at the Holiday Inn, he asked that an extra cot be set up in his room as he was going to have two other men staying with him. This was learned from employees at the Holiday Inn. Trooper Thomas McMullen of the Connecticut State Police, processed the room at the Holiday Inn that had been occupied by Albert Coffey for latent fingerprints on March 7, 1975, and found fingerprints in the room that were positively identified as matching the known fingerprints of Ronald Betres of Pennsylvania and Anthony Just of Pennsylvania. That Ronald Betres is described as a large man and completely bald. That an employee of the Holiday Inn stated that one of the three men Albert Coffey, Ronald Betres, or Anthony Just, asked for directions to Shelton, Connecticut and were directed via Route # 34, which runs past the area where the three kidnapped employees of the Shelton Plant were abandoned.

"That an examination of the telephone records for the Sponge Rubber Products Company in Shelton discloses that two long distance telephone calls were placed on March 1, 1975, from the plant to the Holiday Inn in Danbury.

"That on February 28, 1975, the following three persons checked into the Park Plaza Hotel, New Haven, Connecticut: Bob Bowman, 1258 Library Road, Pittsburgh, Pennsylvania, Paul Willison, 127 Locust St., Harrisburg, Pennsylvania, and John Shaw, 6820 Parkway East, Harrisburg, Pennsylvania. That all Three Men checked into Room 914 and checked out on the morning of March 1, 1975. That the names and addresses of Bob Bowman and Paul Willison were checked by the Pennsylvania State Police and found to be fictitious. The name and address of John Shaw was also checked and it was found that he was the same John Shaw who admitted to participating in the destruction of the Sponge Rubber Products Company plant in Shelton on March 1, 1975.

"That the records of the Tremont Motel in West Haven, Conn., reflect that a man identifying himself as Don Connors, 400 Talbot, Braddock, Pennsylvania, stayed overnight at the Tremont Motel, checking in on February 28, 1975, and out on March 1, 1975. That said records further indicate that he was driving an Avis Rental truck with Pennsylvania registration. That Don Connors was interviewed in Pennsylvania by Agents of the Federal Bureau of Investigation and admitted to having driven an Avis Rental truck to Connecticut on February 28, 1975, and then to a factory in Shelton, Connecticut on March 1, 1975. Don Connors said that he was paid $400 for driving the truck and that he was hired to do this job by Peter Betres of Butler, Pennsylvania, who he has known for at least twenty years.

"That on March 2, 1975, William Povilaitis, chauffer for the Sponge Rubber Products Company, told affiant Robert Geoghan that on February 28, 1975, he was instructed to go to the Bridgeport Railroad Station and pick up David Bubar who lives at the McAlpin Hotel in New York City. William Povilaitis said that he did pick up David Bubar at 12:30 PM and that there was another man with David Bubar and that he was instructed to drive them to a Howard Johnson's Restaurant in Derby, Connecticut. That both men went into the restaurant and subsequently David Bubar came out alone and that they drove back to the Sponge Rubber Products Company Plant in Shelton, leaving the other men in the restaurant. He further stated that on that same day at about 5:30 PM, he again saw the unidentified man on the bridge near the Howard Johnson's Restaurant in Derby, Connecticut. That David Bubar was with him in the company car and that David Bubar told him to pick the man up and he did so and drove David Bubar and the other man to the Sponge Rubber Products Plant in Shelton.

"That William Povilaitis was shown a number of photographs, included among which was a photograph of Peter Betres of Butler, Pennsylvania and he positively identified Peter Betres as the man he picked up with David Bubar at the Bridgeport Railroad Station on February 28, 1975 and also the man he picked up on the bridge near Howard Johnson's Restaurant at about 5:30 PM that same day. William Povilaitis further stated that he had seen Peter Betres at the Sponge Rubber Products Plant in Shelton on two other occasions prior to February 28, 1975.

"That witnesses at the Howard Johnson's Restaurant in Derby, Connecticut, gave information that Peter Betres spent most of the afternoon of February 28, 1975, at said restaurant and that while in the restaurant he was observed using the pay phone and getting change for said pay phone.

"That an examination of the telephone records disclosed that while Peter Betres was at the Howard Johnson's Restaurant during the afternoon of February 28, 1975, five calls were placed from the

restaurant to Pennsylvania, which were as follows: Three calls were made to the Alhambra Hotel, which Peter Betres owns, and two calls to the Gatti Chemical Company, Boyers, Pennsylvania, of which Dennis Tiche is the president.

"That Peter Betres did leave Howard Johnson's late in the afternoon of February 28, 1975 and took a taxi to Zayres Department Store, remained a short while and then returned to Howard Johnson's Restaurant. An examination of telephone records indicated that while Peter Betres was at Zayres Department Store, a phone call was made from the Holiday Inn in Danbury, Connecticut to Zayres Department Store.

"That all records of telephone tolls were obtained by official subpoena.

"That David Bubar was interviewed on March 3, 1975 by affiant Robert Geoghan and other investigators, in the presence of his attorney. David Bubar stated that he was at the Sponge Rubber Products Plant in Shelton on February 28, 1975 and on March 1, 1975. He further stated that he stayed overnight on February 28, 1975, at the Park Plaza Hotel in New Haven, Connecticut. That on the morning of March 1, 1975, he stopped at the Howard Johnson's Restaurant in Derby and was approached by three men who introduced themselves to him. That they told him that they were to make a telephone survey of Plant # 4. David Bubar further stated that he assumed that the three men were representatives of a man named Walter Wilhelm, Audio Communications, Memphis, Tennessee, as he had previously contacted Walter Wilhelm relative to the installation of telephone equipment at the factory in Shelton.

"That on March 4, 1975, agents of the Federal Bureau of Investigation interviewed Walter Wilhelm at his office in Memphis, Tennessee. Walter Wilhelm told the agents that the first time that he had had contact with David Bubar relative to a telephone survey was on March 1, 1975, at Approximately 10:00 PM. At that time David Bubar telephoned and asked Walter Wilhelm how he would like to make a telephone survey on a plant. That David Bubar then told him that he would contact him again on March 2, 1975. Walter Wilhelm further told the agents that David Bubar did call him back on March 2, 1975 at 7:22 AM and said that he needed some help, that there had been an accident at a factory in Connecticut, saying it was just a little fire. That David Bubar also said, 'You know I would not hurt anybody.' That David Bubar asked him to say to anyone who contacted him that he, Walter Wilhelm, was conducting a survey with three of his men at the plant with David Bubar.

"That John Bodyk of Derby, Connecticut, a security guard at the Sponge Rubber Products Company Plant in Shelton said that on February 28, 1975, David Bubar came into the guard station and said, 'This is a big plant, do you make rounds in this place?' That David Bubar further asked how long it took to make rounds and

statement, even after excising the challenged assertion, more than amply convinces us that there was sufficient corroboration of the information provided by Shaw so as to support the issuance of an arrest warrant for the defendant.[23]

Declarations against penal interest by the informant-declarant are another factor used to evaluate the reliability of an informant's information. "Common sense in the important daily affairs of life would induce a prudent and disinterested observer to credit these statements. People do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions. Admissions of crime . . . carry their own indicia of credibility." *United States* v. *Harris,* 403 U.S. 573, 583, 91 S. Ct. 2075, 29 L. Ed. 2d 723

---

how many guards does he have when he makes the rounds. That he told David Bubar 'Two guards and a boilerman.'

"That William Povilaitis, company chauffer, has further stated that on March 1, 1975, at approximately 1:00 PM, David Bubar stated to him that he had three men working at the factory and he had to pay them double time.

/s/Robert Geoghan
/s/Nicholas Valerio

"Subscribed and sworn before me this 22nd day of April, 1975.

/s/Dorothy S. Pohens
Notary Public
My Commission Expires
April 1, 1977"

[23] We note that the defendant's particular involvement in the crime is demonstrated, for example, by Shaw's statements that Anthony Just and Dennis Tiche had viewed the plant; that Shaw had met Just with "Al" and "Ronnie" at a Howard Johnson's restaurant in Derby on March 1, 1975, and that he had been told that "Tony" and "Al" had left in a guard's car with the two guards and the boilerman; that Shaw was driven to an area not familiar to him where he met "Al" and "Tony" who had the three employees; and that he had known Anthony Just, having met him previously; and by the fact that fingerprints of Anthony Just and co-defendant Ronald Betres were found in a room at the Holiday Inn in Danbury.

(1971). Statements against penal interest, such as those made by Shaw in the present case, "may be a substantial basis for crediting an informant's tip and may be considered by an issuing authority in a warrant proceeding." *State* v. *Ferguson,* supra, 115.

Furthermore, we note that "[h]ere, there is no unidentified informer, but a named, available participant in the crime of which the defendant is accused. Although we do not rely solely on the fact that the informant in this case was a participant, we note that this fact has been given great weight in other jurisdictions. . . . [citations omitted.] That the informant was a participant has been held sufficient by itself to support a warrant in some cases. . . ." (Citations omitted.) *State* v. *Jackson,* supra, 451–52.

The United States Supreme Court has stated that the magistrate's determination of probable cause should be paid great deference by reviewing courts. See *Jones* v. *United States,* 362 U.S. 257, 270–71, 80 S. Ct. 725, 4 L. Ed 2d 697 (1960) ; see also *State* v. *Ferguson,* supra, 118; *State* v. *Bember,* supra, 412. Having reviewed the affidavit presented to the magistrate, and having deleted that portion of the affidavit attacked by the defendant, we find no reason to challenge the judge's conclusion that probable cause to arrest the defendant was demonstrated. We conclude, then, that the defendant was not deprived of his due process rights by the failure of the trial court to conduct a hearing on the veracity of the allegations asserted in the affidavit.

## VI

The defendant's final claim of error is that he was denied his sixth and fourteenth amendment right to

the effective assistance of counsel. His argument is solely contingent upon this court's not reaching the merits of those claims of error now made on appeal which were not properly raised below. He argues that "[i]f . . . this court is of the view that the trial attorney's failures now prevent Mr. Just from obtaining appellate relief from these serious violations, it must follow that the trial attorney failed to provide that minimal level of professional competence required by the Sixth and Fourteenth Amendment guarantees of effective assistance of counsel."

"It is fundamental that a defendant in a criminal matter is guaranteed the right to the assistance of counsel. *Gideon* v. *Wainwright,* 372 U.S. 335, 344, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963). The right to counsel is the right to the effective assistance of counsel. *McMann* v. *Richardson,* 397 U.S. 759, 771 n.14, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970); *Reece* v. *Georgia,* 350 U.S. 85, 90, 76 S. Ct. 167, 100 L. Ed. 77 (1955); *Powell* v. *Alabama,* 287 U.S. 45, 71, 53 S. Ct. 55, 77 L. Ed. 158 (1932). ' "Defense counsel's performance must be reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. The defendant's burden is to show that his counsel's conduct fell below that standard and that the lack of competency contributed to the conviction." ' *State* v. *Clark,* 170 Conn. 273, 283, 365 A.2d 1167, cert. denied, 425 U.S. 962, 96 S. Ct. 1748, 48 L. Ed. 2d 208 (1976)." *Siemon* v. *Stoughton,* 184 Conn. 547, 554, 440 A.2d 210 (1981); see *State* v. *McClain,* 171 Conn. 293, 370 A.2d 928 (1976).

We initially wish to reemphasize that the issue of the adequacy of trial counsel is more properly

pursued on a motion for a new trial or on a petition for a writ of habeas corpus, rather than on a direct appeal. See *State* v. *Barber,* 173 Conn. 153, 154–55, 376 A.2d 1108 (1977). Absent an evidentiary hearing on this issue, the claim is extremely difficult to review. See Id.

From what is before us, however, we find no merit to the defendant's argument. Even though several of the defendant's present claims of error were not raised below, we have, in this opinion, reviewed the disputed claims as if they had been properly raised. Our conclusion on each of these issues does not support a finding of ineffective assistance of counsel.

We also take note of the numerous pretrial motions filed by the defendant's trial counsel,[24] the extensiveness of the cross-examination of the state's witnesses made by the defendant's trial counsel, the various exceptions and objections made by him, and the efforts of the defendant's trial counsel to obtain witnesses to testify on behalf of the defendant.[25]

---

[24] The defendant has not rebutted the state's assertion that "the defendant's trial counsel . . . file[d] nineteen pre-trial motions including three motions directed toward the amount of bond; two motions addressed to grand jury proceedings; five motions to dismiss including motions directed toward alleged pre-trial publicity, double jeopardy, alleged defects in the grand jury proceeding, alleged defects in the warrant affidavit and alleged multiplicity; two motions to secure transcripts; a motion to impound and preserve investigator's notes and documents; motions for bill of particulars, supplemental bill of particulars, discovery and inspection, list of witnesses, and to incur expenses; and a motion to re-argue and reconsider certain adverse rulings on certain of the initial motions."

[25] Also unrebutted is the state's claim that the defendant's trial counsel "subpoenaed witnesses from Pennsylvania to testify for the defendant and personally arranged both transportation and hotel accommodations for those witnesses including advancing his own personal funds only to have the defendant inform those witnesses not to come to Connecticut to testify."

We further take heed of the court's comment to counsel which was made at the end of the trial: "I think for the record I would like to compliment both the state and Mr. Goldberger [the defendant's trial counsel] for the efforts put into this case, both on behalf of the State of Connecticut and on the defense. Mr. Goldberger had a very difficult job to perform as a special public defender in this case, especially in view of the attitude and conduct of the defendant himself who has wilfully and intentionally absented himself from this trial."[26]

We agree with the state's claim that "the defendant has not in any way demonstrated that his trial counsel was incompetent or that he failed to display the competence displayed by lawyers with ordinary training and skill in criminal law."

There is no error.

In this opinion the other judges concurred.

---

[26] The defendant, who was present in court for the trial, failed to appear in court after the state rested its case, thereby resulting in a forfeiture of his appearance bond.