## STATE OF CONNECTICUT *v.* WILLIAM NEMETH

COTTER, C. J., BOGDANSKI, PETERS, HEALEY and PARSKEY, Js.

Argued October 15—decision released December 2, 1980

*Alphonse DiBenedetto,* public defender, for the appellant (defendant).

*Donald A. Browne,* state's attorney, with whom, on the brief, was *Domenick J. Galluzzo,* assistant state's attorney, for the appellee (state).

BOGDANSKI, J. The defendant was charged with the crime of manslaughter in the first degree in that on or about July 6, 1975, with intent to cause physical injury to one Kathryn Whitright, a/k/a Jody Nemeth, he did cause her death in violation of § 53a-55 (a) (1) of the General Statutes. Upon a trial to a jury, the defendant was found guilty. From the judgment rendered upon the verdict, he took this appeal claiming the trial court committed error: (1) in an evidentiary ruling concerning the defendant's disappearance after the crime; (2) in the admission of the testimony of two ballistic experts; (3) in refusing to charge as requested; (4) in the sufficiency of the evidence for conviction; and (5) in the instructions on the issue of intent.

The evidence adduced at the trial included the following: In March of 1975 the defendant and his common-law wife, Kathryn Whitright, a/k/a Jody Nemeth, moved from Florida to Connecticut. Initially, they lived in Fairfield with the defendant's uncle, George Nemeth, until June, 1975, when they moved to an apartment at 1882 North Avenue, Bridgeport. The defendant drank frequently and the uncle noticed that after drinking he became sullen, mean and argumentative. While living with the uncle the defendant had a quantity of firearms including a .30 caliber rifle, two .38 caliber pistols and a .350 caliber magnum pistol, all of which he took with him when he moved to North Avenue. On arriving in the Bridgeport area, the defendant obtained employment as a night cleanup man at a bowling alley known as Bowl-O-Rama. His hours were from midnight until the following morning.

Sunday morning, July 6, 1975, the defendant and Jody Nemeth stopped at the house of the uncle and stayed until 11:30 a.m. On that occasion the defend-

ant and Jody Nemeth quarreled about the defendant's drinking and Jody Nemeth asked him not to drink so much. The defendant, in effect, told her to shut up.

At 1:30 p.m. two Bridgeport police officers met and spoke with the defendant and Jody Nemeth near his apartment on North Avenue. This was the last time that she was seen alive by anyone other than the defendant. At 5 p.m. the defendant again stopped at his uncle's house and told him he was looking for Jody; that they had quarreled about his drinking and Jody had walked out on him. At 8 p.m. the defendant phoned his uncle and again inquired as to the whereabouts of Jody. The defendant did not report for work that night at the Bowl-O-Rama.

On Monday evening, July 7, the uncle called and spoke with the defendant. At that time the defendant told his uncle that Jody was "all right." That night the defendant reported for work and clocked his time card at 11:59 p.m. At the time the cash register at the Bowl-O-Rama contained employee paychecks, including the defendant's, and $150 in cash. On the following morning, Tuesday, July 8, the defendant was not at the Bowl-O-Rama. The defendant's paycheck, and the $150 in cash, were missing from the cash register. From about midnight on July 8 the defendant's whereabouts were unknown until he was arrested in the state of Texas in February, 1976.

Tuesday morning, July 8, George Nemeth received a phone call from Bowl-O-Rama which prompted him to go to the defendant's apartment. He received no response when he knocked at the door. He then drove to where Jody Nemeth was

employed and learned that she had not been there since the previous Friday. He returned to 1882 North Avenue and suggested to the landlord that they enter the Nemeth apartment. Together with another individual they entered the apartment and found a locked bedroom door. They removed the hinges of the door and gained entrance to the bedroom. Inside, they found a bundle of blankets saturated with blood which appeared to be wrapped around something and immediately called the police. The police opened the wrapped blankets and found a young woman's dead body inside. The body was subsequently identified as that of Jody Nemeth.

An autopsy revealed the presence of a single bullet hole in the victim's left temple and lesser injuries such as bruised lips and two black eyes which had been inflicted prior to death. The bullet was removed and delivered to the police. The pathologist determined the cause of Jody Nemeth's death to be the injury to her brain from the bullet wound. He expressed an opinion that Jody Nemeth was killed more than twenty-four hours before the autopsy. The medical examiner gave an opinion that death had occurred between twelve and forty-eight hours prior to his examination.

Between March and July of 1975 the defendant had visited his sister at her home in Monroe. He brought a pistol with him in order to engage in target practice in the area. He borrowed a small baking tin from his sister and went to a nearby abandoned baseball backstop to shoot his pistol. On July 17, 1975, the sister accompanied by the police returned to the abandoned backstop, located the small baking tin and retrieved a bullet from the wooden backstop.

On July 21, 1975, the Bridgeport police requested a nationwide alert for the defendant's automobile. That vehicle was located in Stroudsburg, Pennsylvania, parked next to a bus terminal. In February, 1976, the defendant was located and arrested in Amarillo, Texas.

The defendant first claims that while evidence of a suspect's flight is admissible, proof that the defendant knew he was wanted by the police is required before such evidence is admissible.

Proof that a suspect had actual knowledge that he was being charged with a criminal offense is not required for the admission of evidence of his flight. *United States* v. *Malizia,* 503 F.2d 578, 582 (2d Cir. 1974), cert. denied, 420 U.S. 912, 95 S. Ct. 834, 42 L. Ed. 2d 843 (1975) ; *Shorter* v. *United States,* 412 F.2d 428, 430 (9th Cir.), cert. denied, 396 U.S. 970, 90 S. Ct. 454, 24 L. Ed. 2d 436 (1969). It is not essential to the admissibility of evidence of flight that it be shown that the defendant knew he was wanted for the offense. 1 Wharton, Criminal Evidence (13th Ed. Torcia) § 214 n.94.

In *State* v. *Mayell,* 163 Conn. 419, 425, 311 A.2d 60 (1972), we stated: "Flight may be established by proof of the efforts of the police to locate the defendant. . . . Such proof, however, must be supported by either direct or inferential evidence that the defendant knew he was wanted by the police." This language does not mean, as the defendant contends, that the state cannot introduce evidence of a search for the defendant unless the defendant knows that he is being sought by the police. In *Mayell* the proof of flight, coupled with the other circumstantial evidence in the case, was insufficient to prove the defendant guilty beyond a reasonable

doubt. The probative value of evidence of flight depends upon all the facts and circumstances and is a question of fact for the jury. The state need not present evidence that the defendant knew he was being sought for a particular offense.

At the trial, Marshall Robinson, a firearms expert, testified that the bullet taken from the head of Jody Nemeth and the bullet retrieved from the baseball backstop were Winchester Western ammunition but that he was unable to determine whether the bullets had been fired from the same gun. Thereafter, James F. McDonald, another firearms expert, testified that both bullets had been fired from the same gun. The defendant claims that allowing the state to put on its second ballistics expert whose testimony was in conflict with its first expert permitted the state to impeach its own witness.

To begin with, it is not clear from the record that the testimony of the two witnesses was contradictory. In any event the rule against a party impeaching his own witness does not mean that a subsequent witness is totally barred from giving testimony that may be contrary to that given by an earlier witness. *United States* v. *Williamson,* 424 F.2d 353, 355 (5th Cir. 1970); *Delfino* v. *Warners Motor Express,* 142 Conn. 301, 307, 114 A.2d 205 (1955); 81 Am. Jur. 2d, Witnesses § 625; Tait & LaPlante, Handbook of Connecticut Evidence § 7.18 (b). There is a clear distinction between a direct attack on the credibility of one's witness and a contradiction of his testimony by other independent evidence. The latter does not constitute impeachment. *Commonwealth* v. *Staino,* 204 Pa. Super. 319, 204 A.2d 664 (1964). The trial court did not err in its ruling.

The defendant further argues that the trial court erred in refusing to adopt the defendant's request to charge. The request to charge read as follows: "The law does not compel a defendant in a criminal case to take the witness stand and testify, and no presumption of guilt may be raised and no inference of any kind may be drawn from the failure of a defendant to testify. As stated before, the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing evidence."

The relevant law at the time of this trial was clearly set forth in *State* v. *Branham,* 171 Conn. 12, 368 A.2d 63 (1976); see also *State* v. *Burke,* 182 Conn. 330, 332–33, 438 A.2d 93 (1980). In *Branham,* we said that "[i]n the absence of controlling statutory provisions the accused is not entitled to an instruction that no opinion prejudicial to him should be drawn from his failure to testify." *State* v. *Branham,* supra, 16. No such controlling statute existed at the time of the defendant's trial.[1] Indeed, the defendant concedes that he is not the beneficiary of the amendment of § 54-84 (b). Nevertheless, he claims that because he has a constitutional right to a fair trial under the due process clauses of the state and federal constitutions, the failure of the court to charge as requested constituted reversible error. The best that the defendant can do to raise this claim to constitutional dimensions, however, is to claim that the United States Supreme Court appears ready to make the right to a no inference instruction a con-

---

[1] After the defendant's trial, the legislature enacted § 54-84 (b). This amendment provides that "[u]nless the accused requests otherwise, the court shall instruct the jury that they may draw no unfavorable inferences from the accused's failure to testify. . . ."

stitutional right as a logical extension of the fifth amendment right against self-incrimination, to be imposed against the states through the fourteenth amendment. Thus, by the defendant's own account, there is no such constitutional right at present. We decline to extend constitutional status to this claim.

The defendant also contends that his motion to set aside the verdict should have been granted on the ground that there was insufficient evidence to establish guilt beyond a reasonable doubt.

When a verdict is challenged because of insufficient evidence, the issue is whether the jury could have reasonably concluded, upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt. *State* v. *Ruiz,* 171 Conn. 264, 276–77, 368 A.2d 222 (1976); *State* v. *Benton,* 161 Conn. 404, 407, 288 A.2d 411 (1971). It is the province of the jury to draw reasonable and logical inferences from the facts proved. *State* v. *Williams,* 169 Conn. 322, 336, 363 A.2d 72 (1975). There is no distinction between direct and circumstantial evidence so far as probative force is concerned; *State* v. *Cari,* 163 Conn. 174, 179, 303 A.2d 7 (1972); and the evidence must be given a construction most favorable to sustaining the jury's verdict. *State* v. *Brown,* 169 Conn. 692, 695, 364 A.2d 186 (1975).

A review of the evidence reveals that the defendant was the last person to be seen with Jody Nemeth alive and that he had been drinking and behaving in a hostile manner toward her. Moreover, the factual time sequence is significant. The medical examiner placed outside limitations on the time of death as noon, Sunday, July 6 and Monday, July 7,

before midnight. The pathologist placed the time of death to be at least twenty-four hours before the autopsy or prior to Monday, July 7, at 1 p.m. The victim was last seen alive on Sunday, July 6, at 1:30 p.m. by two police officers. The defendant told his uncle at 9 p.m. on Monday, July 7, that Jody was "all right." Four hours later the defendant appeared at his place of work, and took his paycheck and his employer's cash. The bullet which killed the victim and the bullet retrieved from Monroe were similar and in the opinion of one of the ballistic experts had been fired from the same weapon. Of further significance was the defendant's immediate disappearance, abandonment of his car in Pennsylvania and the failure to communicate with his relatives. That evidence, if found to be credible, was a sufficient basis from which the jury could reasonably have determined that the defendant was guilty of the crime charged.

Lastly, the defendant claims that the court's instructions to the jury violated his right to due process by shifting the burden of proof on the element of intent to the defendant. See *Sandstrom* v. *Montana,* 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979), and *State* v. *Harrison,* 178 Conn. 689, 425 A.2d 111 (1979). We have carefully examined the court's entire charge and conclude that the actual instructions as given by the trial court were not impermissible instructions such as were condemned in *Sandstrom* and *Harrison* but were instead virtually the identical instructions which were determined by this court not to constitute reversible error. *State* v. *Arroyo,* 180 Conn. 171, 429 A.2d 457 (1980).

There is no error.

In this opinion the other judges concurred.