STATE OF CONNECTICUT *v.* SALVATORE SCIELZO
(10409)

PETERS, HEALEY, PARSKEY, SHEA and GRILLO, Js.

Argued February 4—decision released May 24, 1983

*Bruce L. Levin,* special public defender, for the appellant (defendant).

*Julia D. Dewey,* assistant state's attorney, with whom, on the brief, was *Arnold Markle,* state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. The defendant was charged in an amended information with the crime of larceny in the second degree by receiving and disposing of stolen goods with a value in excess of $500. See General Statutes (Rev. to 1977) §§ 53a-123 (a) (2),[1] 53a-119 (8).[2] He was found guilty as charged after a trial to the jury. This appeal followed.

On appeal, the defendant claims that (1) the state failed to prove that he knew or believed that the property he received was probably stolen; (2) the state failed to adduce evidence that the value of the property received by him exceeded $500; and (3) he was afforded ineffective assistance of counsel at the time of trial.

In view of the direct and circumstantial evidence before the jury, they could have reasonably concluded that the state had satisfied its burden of proving the defendant's guilt under the amended information of larceny by receiving stolen property as that is defined by General Statutes § 53a-119 (8).

Viewing the evidence in the light most favorable to sustaining the verdict, the jury could have found the following facts: On July 6, 1977, the Milford-Orange YMCA purchased a new "Boston Whaler" (Whaler) boat from the Olson Marine Company[3] for $1550. This

---

[1] In 1977, General Statutes § 53a-123 (a) (2) provided in pertinent part: "(a) A person is guilty of larceny in the second degree when: . . . (2) the value of the property or service exceeds five hundred dollars . . . ."

[2] General Statutes (Rev. to 1977) § 53a-119 (8) provided: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. Larceny includes, but is not limited to: . . . (8) Receiving stolen property. A person is guilty of larceny by receiving stolen property if he receives, retains, or disposes of stolen property knowing that it has probably been stolen or believing that it has probably been stolen, unless the property is received, retained or disposed of with purpose to restore it to the owner."

[3] The defendant was formerly employed by the Olson Marine Company as a mechanic.

boat was 14 feet long, fully equipped, and included a 1975 Evinrude outboard motor. It had previously been registered with the Connecticut department of motor vehicles by Olson Marine and assigned the registration number CT369X. The YMCA kept the Whaler at the Milford Harbor Marina in Milford.

On August 1, 1977, the director of the YMCA complained to the Milford police department that the Whaler had been stolen from its slip at the Milford Harbor Marina. It was stolen by the state's witness Larry Brackett, who had pled guilty to larceny in the second degree for that larceny sometime prior to the defendant's trial.[4] When he stole it, Brackett took the boat by water to the backyard of his Milford home.[5] When he got it to his backyard he "started taking it apart" and he took off "everything that wasn't tied down." He took off or removed the motor, gas tanks, engine mounting, controls, wiring, throttle, shift, ignition, electrical wiring, gas cable, throttle cable, motor harness, battery and battery box, steering cables, pullies and lights. In addition, he removed an identification number plate on the outside of the boat which was held on by bolts or rivets. He also observed the numbers "396" on the bow of the stolen Whaler. He put putty in the area where he had removed the number from the outside of the boat. The same number was also embossed inside the hull in the back of the boat; he filled or covered it with putty.

After Brackett had stripped the boat, he tried to sink it[6] in the swamp behind his backyard. The boat,

---

[4] Brackett testified at the trial that he pled guilty to the larceny of the boat. At that time, upon cross-examination by the defendant's counsel, the following then took place: "Q. You received a suspended sentence from [sic] probation, didn't you? A. Yes."

[5] Brackett testified that his backyard was "accessible by the water."

[6] He testified that the reason he did this was because all he wanted from the boat was the motor and the equipment.

however, did not sink. While most of it was submerged at high tide, at low tide it just sat in the mud. After a time, Brackett dragged it out of the swamp, bottom side down, over rough ground to his backyard.

Sometime thereafter in August, 1977, David Williams[7] visited his friend Brackett at the latter's house. While there, he saw the Whaler on a trailer and had a conversation with Brackett about the boat. As a result of that conversation, Williams showed the boat to the defendant a few days later while it was still in Brackett's yard. At that time Williams told him that the boat "was an insurance fraud," that it was a few months old and that "it was a little bit hot." The defendant was interested in taking it and Williams told the defendant he wanted about $500. Williams believed the defendant told him he would pay $300 for it.[8] About a week or two later after the defendant removed the Whaler and the trailer from Brackett's yard, Williams went to see the defendant and asked him if he had any money for the boat. The defendant told him to come back "about a week later." The second time Williams went back to see the defendant, the latter told him it was the YMCA's boat and also asked Williams why he had not told him it was the YMCA's boat. The defendant told him he had gotten rid of the boat in New York. Williams testified that he had told the defendant the boat was stolen. Williams received $100 from the defendant for the boat.

After the Whaler and the trailer had disappeared from his backyard, Brackett asked Williams where the trailer was and requested that he get it back. Williams told him that someone from the Marine Engine Ser-

[7] Williams entered a plea in connection with this incident and received accelerated rehabilitation.

[8] At that time the boat was on a trailer and Williams knew that the trailer belonged to a friend of Brackett's.

vice had picked up the boat and the trailer. Brackett went to the Marine Engine Service, which was owned and operated by the defendant, and inquired of the defendant about the trailer. The defendant told him "they had to get rid of it."

The state's witness, Alfred L. Fernald, had been employed by the Olson Marine Company for thirty years and was the service manager in July, 1977. He knew the defendant who was a former employee of that company. Fernald testified that the Whaler had a serial number on it, which is the Coast Guard identification number and is fastened to the aluminum plate on the Whaler which is riveted to the fiberglass hull. On the basis of his experience in the boat business, he testified that the significance of that serial number was that "it is similar to the identification number on an automobile. That's the identification number of it." It indicates the serial number, the year it was built and the boat manufacturer. As a boat dealer he would "check to make sure that number was affixed." In addition, there is another identification number on the rear of the boat inside the center of the transom just below where the motor attaches to the back of the boat. That was the Whaler's identification number "which just has meaning to the factory itself." When Ronald Hart, the person to whom the defendant sold the boat, purchased it on September 11, 1977, there was no identification number on the boat.[9]

On September 23, 1977, Robert Slattery, the investigating state trooper, examined the boat that Hart had purchased from the defendant. He had previously contacted the Boston Whaler Company in Massachusetts and he was looking for identification numbers on that boat. In this regard, he looked in the

[9] The receipt that the defendant gave Hart for this transaction did include the words "13 feet 6 inch hull" and "hull number 37925."

area below the engine mount.[10] Slattery removed the Johnson sticker from this location and he found "an area underneath the sticker which had been ground down." He found no serial number in that location. His investigation also disclosed an area on the rear of the boat "with four small holes which appeared to have been filled in with a putty-like or some substance." He never found "any serial numbers on the entire boat."

On the basis of the foregoing evidence we must reject the defendant's claim that he neither knew nor believed that the property he received was probably stolen. " 'We have repeatedly stated the test which this court employs to determine whether the evidence is sufficient to sustain a verdict: " '[T]he issue is whether the [trier] could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt . . . .' " *State* v. *Gaynor*, 182 Conn. 501, 503, 438 A.2d 479 (1980), quoting *State* v. *Festo*, 181 Conn. 254, 259, 435 A.2d 38 (1980); *State* v. *Nemeth*, 182 Conn. 403, 410, 438 A.2d 120 (1980); *State* v. *Saracino*, 178 Conn. 416, 419, 423 A.2d 102 (1979); *State* v. *Jackson*, 176 Conn. 257, 262, 407 A.2d 948 (1978). . . . "[T]he evidence presented at the trial must be given a construction most favorable to sustaining the jury's verdict." *State* v. *Jackson*, supra, 262; see *State* v. *Nemeth*, supra; *State* v. *Chetcuti*, 173 Conn. 165, 172, 377 A.2d 263 (1977). Each essential element of the crime charged must be established by proof beyond a reasonable doubt, " 'and although it is within the province of the [trier] to draw reasonable, logical inferences from the facts proven, [it] may not resort

---

[10] Among the photographs in evidence of the Whaler was one of this area from which he removed the "Johnson sticker." The "Johnson sticker" was also an exhibit in evidence.

to speculation and conjecture.' " *State* v. *Gaynor,* supra, 503; *State* v. *Festo,* supra, 259.' *State* v. *Stankowski,* 184 Conn. 121, 126, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981). Where it cannot be said that a rational trier of fact could find guilt proven beyond a reasonable doubt, then, a conviction cannot 'constitutionally stand,' as it is violative of due process under the fourteenth amendment. *Jackson* v. *Virginia,* 443 U.S. 307, 317–18, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State* v. *Kish,* 186 Conn. 757, 768, 443 A.2d 1274 (1982)." (Footnote omitted.) *State* v. *Haddad,* 189 Conn. 383, 387–88, 456 A.2d 316 (1983). The *Jackson* court took pains to point out that the inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt "does not require a court to 'ask itself whether *it* believes that the evidence . . . established guilt beyond a reasonable doubt.' " (Emphasis in original.) (Citation omitted.) *Jackson* v. *Virginia,* supra, 318–19. The court then said: "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Johnson* v. *Louisiana,* 406 U.S. [356, 362, 92 S. Ct. 1620, 32 L. Ed. 2d 152 (1972)]. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon 'jury' discretion only to the extent necessary to guarantee

the fundamental protection of due process of law."
(Emphasis in original.) (Footnotes omitted.) *Jackson
v. Virginia,* supra, 319; see *United States* v. *Eden,* 659
F.2d 1376, 1382 (9th Cir. 1981), cert. denied, 455 U.S.
949, 102 S. Ct. 1450, 71 L. Ed. 2d 663 (1982).

The defendant argues that although he may have
been found to have known that the Whaler was "an
insurance fraud" and although he was told that it was
a "little hot,"[11] these facts do not suffice to prove him
guilty of receiving stolen goods. Even if we were
inclined to agree that these two circumstances in iso-
lation were not sufficient, there was the additional evi-
dence we have earlier set out. We recognize that "an
error of judgment in failing to realize the stolen char-
acter of the goods is not the equivalent of guilty knowl-
edge." *State* v. *Appletree,* 35 Conn. Sup. 531, 533, 394
A.2d 744 (1977), citing *State* v. *Newman,* 127 Conn.
398, 401, 17 A.2d 774 (1940). Moreover, "[a]ctual
knowledge that the property has been stolen is necessa-
sary, but the trier 'would not be justified in find-
ing knowledge unless the facts referred to were such
that a reasonable man—the accused as a reasonable
man—should have inferred and gathered from them

---

[11] Courts have held that triers of fact have been justified in considering
the word "hot" as synonymous with "stolen." See *United States* v. *Nelson,*
185 F.2d 758, 760 (7th Cir. 1951); *United States* v. *Rappy,* 157 F.2d 964,
966 (2d Cir. 1947), cert. denied, 329 U.S. 806, 67 S. Ct. 501, 91 L. Ed. 688
(1947); *People* v. *Morris,* 124 Cal. App. 402, 403, 12 P.2d 679 (1932). In
this context we note: "Jurors are not 'expected to lay aside matters of
common knowledge or their own observation and experience of the affairs
of life, but, on the contrary, to apply them to the evidence or facts in hand,
to the end that their action may be intelligent and their conclusions cor-
rect.' (Citations omitted.) *Chicago, M. & St. P. Ry. Co.* v. *Moore,* 166 F.
663, 666 (8th Cir. 1909); see *Jutras* v. *Satters, Inc.,* 96 N.H. 300, 302, 75
A.2d 712 (1950); *De Keuster* v. *Green Bay & W. R. Co.,* 264 Wis. 476, 479,
59 N.W.2d 452 (1953); *New Haven* v. *First National Bank & Trust Co.,*
134 Conn. 322, 325, 57 A.2d 494 (1948)." *Frankovitch* v. *Burton,* 185 Conn.
14, 22, 440 A.2d 254 (1981).

knowledge that the goods were stolen.' *State* v. *Weiner,* 84 Conn. 411, 418, [80 A. 198 (1911)]." *State* v. *Appletree,* supra, 534. We conclude that there was sufficient evidence before the jury to enable them reasonably to find that the state had proven the defendant guilty of receiving stolen goods as defined by General Statutes § 53a-119 (8).

The dissent declares that Williams, who was one of the state's witnesses, "changed" his statement. Whether he "changed" his statement or not and, if so, how that weighed with the jury in evaluating all his testimony was for the trial jury who actually saw, heard and sized up Williams as they did any other witness. See, e.g., *State* v. *Hoyeson,* 154 Conn. 302, 305, 224 A.2d 735 (1966); *State* v. *Coulombe,* 143 Conn. 604, 608, 124 A.2d 518 (1956). That was the same trial jury who also saw Williams when he said he felt threatened and afraid of the defendant when the latter came to see him sometime after the theft and before trial. See *Frankovitch* v. *Burton,* 185 Conn. 14, 22, 440 A.2d 254 (1981). It is difficult, therefore, if we employ the required standard of review, to agree that the evidence before the jury could not reasonably support the verdict of guilty. It is recognized that under the *Jackson* standard "credibility choices are solely within the province of the jury, and we must accept whatever choice supports the jury's verdict." *United States* v. *Wuagneux,* 683 F.2d 1343, 1358 (11th Cir. 1982); see *United States* v. *Hewitt,* 663 F.2d 1381, 1384 (11th Cir. 1981). This jury, therefore, could have reasonably found this defendant guilty.

Because the defendant was charged under General Statutes (Rev. to 1977) § 53a-123 (a) (2), the state was required to adduce sufficient evidence to justify the finding by the trier that the value of the property received by the defendant exceeded $500. The defend-

ant claims that there was no evidence that the value of the boat he received exceeded $500. This claim of insufficiency of the evidence goes to an essential element of the crime charged. The state argues that after considering the facts presented and the reasonable inferences therefrom, the jury could, without resort to speculation and conjecture, have found that the state sustained its burden of proving the element of value as alleged in the amended information.

The state argues in its brief and before us that the value generally to be ascribed to stolen property is its value at the time of taking. In argument before us, it urged that value should be determined as of the time of the original theft by Brackett. While claiming that the purchase price is a relevant consideration, it concedes that depreciation is also to be considered. In this regard, it maintains that although the purchase price of $1550 paid for the Whaler by the YMCA on July 6, 1977, was "subject to 20–30% depreciation within 2-3 months," the value of the property still exceeded $500. It goes on to say that value at the time of disposition was $1450. The state's alternative position is that even were we to adopt the defendant's argument that his liability is limited to the value of the property at the time of the transfer to him, there was evidence that "he was able to use the stolen property to provide a motor boat for a willing purchaser at a price of $1,450.00." We cannot accept any of the state's claims that it proved value in excess of $500.

In this state the degree of larceny and the severity of the punishment vary by statute according to the value of the property which is the subject of the crime. See generally *State* v. *Baker,* 182 Conn. 52, 61–62, 437 A.2d 843 (1980). General Statutes (Rev. to 1977) § 53a-123 provides: "(a) A person is guilty of larceny in the second degree when: . . . (2) the value of the prop-

erty or service exceeds five hundred dollars . . . ." General Statutes (Rev. to 1977) § 53a-119 (8) defines larceny by receiving stolen property as follows: "A person is guilty of larceny by receiving stolen property if he receives, retains, or disposes of stolen property knowing that it has probably been stolen or believing that it has probably been stolen, unless the property is received, retained or disposed of with purpose to restore it to the owner. . . ." General Statutes § 53a-121 (a) provides: "[T]he value of property . . . shall be ascertained as follows: (1) . . . value means the market value of the property . . . at the time and place of the crime or, if such cannot be satisfactorily ascertained, the cost of replacement of the property . . . within a reasonable time after the crime. . . ."

Pursuant to these statutes, we must reject the state's claim that the defendant could be convicted on the basis of the value of the Whaler at the time it was originally stolen by Brackett. The defendant could only have committed the crime with which he was charged when he received, retained or disposed of the Whaler. He did not commit any crime at the time Brackett originally stole it. Therefore, the state's claim that the guilty verdict returned by the jury should be sustained requires that we address whether it proved, as required, that the defendant received, retained or disposed of stolen property in excess of $500. The state did not do so. We agree with the defendant that the evidence was clearly insufficient on this essential element of the crime charged.

First, we cannot accept the state's claim that it proved that the value of the Whaler exceeded $500 when the defendant received it from Williams. The evidence simply does not justify any such finding. Value, under § 53a-121, means market value at the time

and place of the crime or if that cannot be "satisfactorily ascertained," the cost of replacement within a reasonable time after the crime. The state did not prove either. The admitted original purchase price of the Whaler of $1550 does not satisfy that burden because the defendant did not "receive" a *new* Whaler. We have set out at some length the thorough stripping of the Whaler effected by Brackett, the actual thief, as well as its treatment and condition thereafter prior to its reception by the defendant. The state goes on to refer to Fernald's testimony that in August or September, 1977, the worth of the Whaler would be "roughly 20 percent less than ($1,550)" which would still be in excess of $500. It should be added that Fernald's "roughly 20 percent less" figure was explicitly conditioned upon its being "in good condition."[12] Its condition had changed in at least two respects. First, it was no longer equipped as it was when sold for $1550. Second, the actual Whaler received by the defendant was, from the testimony and the photographs in evidence, not at all in the condition it was when purchased—nor for that matter when Brackett stole it. While market or replacement value at the time of actual theft may be relevant for grading the offense of larceny, it must be recognized that "[t]he criminal reception of stolen goods may occur at a time far removed from the original taking . . . and they may be in a substantially changed condition." *State* v. *Spraggin,* 71 Wis. 2d 604, 620, 239 N.W.2d 297 (1976). While the statute involved in *United States* v. *Evans,* 446 F.2d 998 (8th Cir. 1971), was different, we favor that court's "practical view that a receiver's penalty must be measured by the value of the property which is received or possessed." Id., 1001.

---

[12] There was no evidence from Fernald or any other state's witness of the value of the Whaler when the defendant received it that could serve to put its value over $500.

"Value in the context of receiving stolen property is usually considered to mean 'fair market value' at the time of reception." *State* v. *Spraggin,* supra.

In *People* v. *Harold,* 22 N.Y.2d 443, 239 N.E.2d 727 (1968), the time frame was much more constricted than in the case at bar. The New York Court of Appeals held that the original purchase price of a pump of $124 was insufficient evidence of its value to sustain a grand larceny conviction when it was stolen *five days* after purchase from a job scene where the original purchase price was the only evidence of value. The pump was stolen after the plumbers, who had commenced installing it, gave up doing so after they had bent the copper tubing, "pushed up" the gauge and "nicked" the pump in several spots. The court said allowance had to be made for the fact that the pump was no longer new. See also *People* v. *Liquori,* 24 App. 2d 456, 260 N.Y.S.2d 409 (1965). In a similar context, the court in *Spencer* v. *State,* 217 So.2d 331 (Fla. App. 1968), reversed a conviction of grand larceny of electrical wire stolen from a power pole. In *Spencer,* evidence was that the theft of the wire in question, which was strung on power poles, cost ninety cents per foot including transportation and installation. The state was required to prove that the property stolen was worth in excess of $100. In holding that the state had not done so, the *Spencer* court said: "The thing stolen was not the installed wire, but was the wire after it had been severed and dropped to the ground. . . . It is our conclusion that the cost of the wire in place is not the criterion of value authorized by the statute." Id., 332.

The same lack of evidence of the necessary value to justify a finding of larceny in the second degree that exists when the defendant actually received the stolen property persists thereafter during the retention of the criminal possession of the Whaler through its disposi-

tion by the defendant to Hart for $1450. Although it is a fair inference that the defendant was able to "use" the Whaler while it was in his possession so as to sell it to Hart for $1450, the state's claim that that evidence proves the Whaler's value itself to be over $500 is specious. Actually, the evidence is that the defendant sold Hart not only the Whaler (presumably quite operable),[13] but also a 40 horsepower Johnson motor and a boat trailer. The defendant had worked on the boat after he received it; how much it was increased in value is not disclosed by the evidence. It is true that Williams testified that he got $100 from the defendant, but the Whaler and a trailer were taken from Brackett's backyard after the discussion between the defendant and Williams. The trailer, which did not belong to Brackett, was not returned and there is no evidence that that was the trailer sold to Hart. The evidence of value of the property received, i.e., the Whaler, retained and disposed of was such that the jury could not find its value to be in excess of $500 except on speculation or conjecture. The state did not maintain its burden on this essential element of the crime charged. See *In re Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State* v. *Griffin,* 175 Conn. 155, 162, 397 A.2d 89 (1978).

In this case, the trial court instructed the jury on the lesser included crimes of larceny down to and including larceny in the fourth degree. The defendant does not claim error as to any portion of the charge. Therefore, the jury's verdict in this case includes a determination based upon sufficient evidence that all the elements of the lesser included crime of larceny in the fourth degree

[13] On either the day before or the day the defendant sold Hart the boat he took Hart out in the boat to show him how it operated.

had been proven beyond a reasonable doubt.[14] "Since the jury could have explicitly returned such a verdict, the defendant was well aware of [his] potential liability for this crime and would not now be prejudiced by modification of the judgment rendered on the verdict consistent with the above. See *State* v. *Grant,* 177 Conn. 140, 146–47, 411 A.2d 917 [1979]." *State* v. *Saracino,* 178 Conn. 416, 421, 423 A.2d 102 (1979); see *State* v. *Coston,* 182 Conn. 430, 437, 438 A.2d 701 (1980). Such a modification of the judgment is appropriate here.

The defendant's final claim is that he was denied effective assistance of counsel at trial. It is treated cursorily in the defendant's brief but he points out that trial counsel was appointed as a special public defender and "entered his appearance only one month before trial."[15] Trial counsel's motion for a continuance to engage in further investigation and trial preparation was denied. Appellate counsel, in briefing this issue, states that "[a]t this juncture . . . [he] simply would posit that based on facts disclosed by the trial transcript, this is a case which should have culminated in a verdict of not guilty." The state argues that there is no evidence to support the defendant's claim of ineffective assistance of counsel at trial as well as no evidence to link this claim with the verdict rendered.

" 'It is fundamental that a defendant in a criminal matter is guaranteed the right to the assistance of counsel. *Gideon* v. *Wainwright,* 372 U.S. 335, 344, 83

---

[14] General Statutes § 53a-121 (a) provides in part: "(3) When the value of property . . . cannot be satisfactorily ascertained pursuant to the standards set forth in this section, its value shall be deemed to be an amount less than fifty dollars."

[15] An examination of the transcript discloses that the defendant had first been represented by private counsel and thereafter by the public defender, both before the appearance of trial counsel.

S. Ct. 792, 9 L. Ed. 2d 799 (1963). The right to counsel is the right to the effective assistance of counsel. *McMann* v. *Richardson,* 397 U.S. 759, 771 n.14, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970); *Reece* v. *Georgia,* 350 U.S. 85, 90, 76 S. Ct. 167, 100 L. Ed. 77 (1955); *Powell* v. *Alabama,* 287 U.S. 45, 71, 53 S. Ct. 55, 77 L. Ed. 158 (1932). " 'Defense counsel's performance must be reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. The defendant's burden is to show that his counsel's conduct fell below that standard and that the lack of competency contributed to the conviction.' " *State* v. *Clark,* 170 Conn. 273, 283, 365 A.2d 1167, cert. denied, 425 U.S. 962, 96 S. Ct. 1748, 48 L. Ed. 2d 208 (1976).' *Siemon* v. *Stoughton,* 184 Conn. 547, 554, 440 A.2d 210 (1981); see *State* v. *McClain,* 171 Conn. 293, 370 A.2d 928 (1976).

"We initially wish to reemphasize that the issue of the adequacy of trial counsel is more properly pursued on a motion for a new trial or on a petition for a writ of habeas corpus, rather than on a direct appeal. See *State* v. *Barber,* 173 Conn. 153, 154–55, 376 A.2d 1108 (1977). Absent an evidentiary hearing on this issue, the claim is extremely difficult to review. See Id." *State* v. *Just,* 185 Conn. 339, 370–71, 441 A.2d 98 (1981); see also *State* v. *Mason,* 186 Conn. 574, 577–78, 442 A.2d 1335 (1982).

From what is before us, we find no merit to this claim of the defendant. We have already noted the paucity of the factual predicate for this claim in his brief. We do, however, also note that trial counsel's motion for a continuance involved a contested evidentiary hearing, that he took many objections and exceptions during the trial, that he often cited authority for his claims at trial and that he conducted extensive examinations of various state's witnesses both on the voir dire and

cross-examination. In addition, he filed a number of motions before, during and after trial including moving for election, supplemental discovery, reargument of dismissal, suppression of statements, exclusion of evidence of certain claimed misconduct, and for acquittal and judgment of acquittal. He also filed requests to charge and took exceptions to the court's instructions to the jury. His motion for judgment of acquittal, which was comprehensive, was premised on the grounds of insufficient evidence including the element of value.

Accordingly, the case is remanded for modification of the judgment in accordance with this opinion and for resentencing on the lesser included offense of larceny in the fourth degree as that statute existed at the time the defendant was arrested and charged in this case.

In this opinion PETERS, PARSKEY and GRILLO, Js., concurred.

SHEA, J. (dissenting). I do not quarrel with the holding that the judgment must be modified to a conviction of larceny in the fourth degree because there was insufficient evidence of the value of the property which is the subject of the larceny. I would not have reached this issue, however, because I disagree with the position of the majority that there was sufficient "direct and circumstantial" evidence to support a finding that the defendant knew or believed that the boat had "probably been stolen" during the period of time he received, retained or disposed of it, as is necessary for the offense of larceny by receiving stolen property. General Statutes (Rev. to 1977) § 53a-119 (8).

The only direct evidence concerning the knowledge of the defendant that the boat was stolen came from

David Williams. At one point in his direct examination, after saying that the defendant had berated him for not disclosing that it was the YMCA boat, he testified that he had told the defendant the boat was stolen,[1] as the majority opinion states. Later in his direct

---

[1] Williams testified that in late August, 1977, he first saw the boat in the yard of his friend Brackett, who had actually stolen the boat. A few days later he brought the defendant to see the boat in the yard. The first testimony of Williams about what he told the defendant of the status of the boat was as follows:

"Q. Did you tell him where it (the boat) had come from?

"A. I told him that it was an insurance fraud.

"Q. You told this to the defendant?

"A. Yes."

Williams next testified on this subject as follows:

"Q. Did you tell him it was a few months old?

"A. Yes.

"Q. Did you tell him it was a little bit hot?

"A. Yes."

Later in his direct examination Williams testified that a week or two after his first encounter with the defendant, as a result of which the defendant took possession of the boat, he visited the defendant at his place of business to request his money. The defendant told him to come back about a week later. Williams did not observe the boat on the premises at that time. He then testified as follows:

"Q. As you went to leave, did you observe the boat there at that time, the Boston Whaler?

"A. No.

"Q. As you went to walk out the door, did you say anything to him?

"A. Not that I recall.

"Q. Did he say anything to you?

"A. Not that I recall.

"Q. Did he (defendant) say anything to you about the YMCA?

"A. That was a while after. I think it was the second time I went back. He said it was the YMCA boat.

"Q. What did he say to you?

"A. He asked me why didn't I tell him it was the YMCA boat.

"Q. Did he tell you what he had done with the boat?

"A. He said he had gotten rid of it in New York.

"Q. What else did he tell you on that occasion?

"A. I don't recall.

"Q. Had you told him the boat was stolen?

"A. Yes."

testimony, however, he changed his statement to indicate that he had merely told the defendant that "the boat was just only an insurance fraud" and had been reported "stolen for insurance purposes."[2] Williams then testified that in a later conversation, when he went back to obtain his money for the boat, he found out from the defendant that the boat was stolen and that it belonged to the YMCA.[3] On cross-examination he reiterated that he had merely told the defendant that the boat was the subject of an insurance fraud and that, by the time he later learned that the boat had been stolen, it had been disposed of by the defendant.[4] He

[2] This portion of the testimony was as follows:

"Q. When you brought him to the Boston Whaler in August of 1977 and showed it to him, was there any question but you told him that it was stolen?
(Objection overruled)

"A. At the beginning of when I first brought Sal to the boat, it was, 'I understand that the boat was just only an insurance fraud.'

"Q. That's what you told him?

"A. To report it stolen for insurance purposes.

"Q. Is that what you told him?

"A. Yes, that's what I told Sal."

[3] This testimony followed immediately after that set forth in footnote 2:

"Q. Did you later have other conversations with him about the boat being stolen in August of 1977?

"A. Yes, when I went back to get money from him. I found out the boat was stolen. He had gotten rid of it. Then he told me it was a YMCA boat."

[4] This testimony was as follows:

"Q. And the first time when you were scared was with the Milford police, and at that time you said that Mr. Scielzo knew the boat was stolen, didn't you? That's what you told the Milford police the first time, wasn't it?

"A. That it was an insurance fraud, and afterwards, I found it was stolen.

"Q. But first you told him it was an insurance fraud?

"A. Yes.

"Q. You didn't tell him later it was stolen, right?

"A. That's when I found out about it, yes.

"Q. And the boat was sold by that point, wasn't it?

"A. Yes, as far as I know.

"Q. It wasn't on the property of the Marine Engine Service Company, was it?

"A. No, it wasn't."

also said that he thought that Larry Brackett, in whose yard he first saw the boat, was claiming that the boat was stolen in order to obtain some insurance money.[5] He repeated twice on redirect examination that he had merely told the defendant the boat was part of an insurance fraud.[6] I do not comprehend how the testimony of this key witness, taken as a whole, can be construed by the majority to indicate that the defendant was told the boat was stolen at any time when he had possession of it.

The majority also appear to rely on circumstantial evidence to establish the element of knowledge or belief of the "stolen" status of the property. The opinion, however, fails to specify precisely which circumstances are relied upon as proof that the defendant was aware that the boat was stolen, in contradistinction from its involvement in an insurance fraud. The plenitude of circumstances recited is as consistent with the one as with the other. The suspicious nature of the transaction, the low price paid for the boat, the obliteration of identification numbers and the use of the term "hot" in reference to the boat jibe equally well with a belief on the part of the defendant that Brackett wanted to dispose of a boat for which he had made an insurance claim and

---

[5] This testimony was as follows:

"Q. So you didn't know the boat was stolen when you first saw the boat, did you?

"A. No.

"Q. All you thought was that Larry Brackett was claiming it was stolen in order to get some insurance money, right?

"A. Yes."

[6] This testimony was as follows:

"Q. Now, when you were asked, sir, whether or not you told the investigator for the defense that the boat was part of an insurance fraud, that was true, you did tell the defendant that, didn't you?

"A. Yes. . . .

"Q. What did you tell the investigator for the defense about whether or not it was stolen?

"A. That it was an insurance fraud."

was using Williams as an intermediary, just as the latter testified. Where the evidence as a whole is reasonably capable of a noncriminal explanation, it must be viewed in that light. *State* v. *McDonough,* 129 Conn. 483, 485–86, 29 A.2d 582 (1942).

The majority do not, at least explicitly, adopt the position that knowledge that the boat was involved in an insurance fraud satisfies the statutory requirement of knowledge or belief that the property "has probably been stolen." General Statutes (Rev. to 1977) § 53a-119 (8). Such a broad interpretation of "stolen" might well be socially desirable but would conflict with the basic principle that criminal statutes must be strictly construed. *Nowak* v. *Nowak,* 175 Conn. 112, 125, 394 A.2d 716 (1978); *State* v. *Cataudella,* 159 Conn. 544, 555, 271 A.2d 99 (1970). We have previously held that an error of judgment in failing to realize the stolen character of property is not the equivalent of guilty knowledge. *State* v. *Newman,* 127 Conn. 398, 401, 17 A.2d 774 (1940); see *State* v. *Appletree,* 35 Conn. Sup. 531, 533–34, 394 A.2d 744 (1977).

Although few would shed a tear for the defendant, whose social culpability is as great as if he had actual knowledge of the theft of the boat while it was in his possession, it is fundamental that no person may be convicted except where every element of the crime charged has been proved beyond a reasonable doubt. In my view that standard was not met in this case. Accordingly, I dissent.