## STATE OF CONNECTICUT *v.* ARTHUR COLE
### (AC 17740)

O'Connell, C. J., and Schaller and Daly, Js.[1]

Argued October 22, 1999—officially released May 2, 2000

*Avery S. Chapman,* for the appellant (defendant).

*Toni M. Smith-Rosario,* deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Elpedio N. Vitale,* senior assistant state's attorney, for the appellee (state).

---

[1] The listing of judges reflects their seniority status on this court as of the date of oral argument.

*Opinion*

DALY, J. The defendant, Arthur Cole, appeals from the judgment of conviction, rendered after a jury trial, of two counts of accessory to robbery in the first degree with a firearm in violation of General Statutes §§ 53a-8 and 53a-134 (a) (4),[2] two counts of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48[3] and 53a-134 (a) (4), and two counts of larceny in the second degree as an accessory in violation of General Statutes §§ 53a-8 and 53a-123 (a) (3).[4] The sole issue on appeal is the defendant's claim that the evidence presented by the state was insufficient to sustain the conviction. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On Sunday, April 28, 1996, the defendant went to the New Haven apartment where his girlfriend's sixteen year old nephew, Joseph Jackson, resided. Ajaye Alston,

[2] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon; or (3) uses or threatens the use of a dangerous instrument; or (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm . . . ."

[3] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[4] General Statutes § 53a-123 (a) provides in relevant part: "A person is guilty of larceny in the second degree when he commits larceny as defined in section 53a-119 and . . . (3) the property, regardless of its nature or value, is taken from the person of another . . . ."

who was fifteen years old, was living in the apartment with Jackson. Alston overheard the defendant and Jackson speaking for approximately forty-five minutes concerning their plan to rob the Centerbank branch on Whalley Avenue the following day. The plan included Jackson robbing the bank and the defendant driving the getaway vehicle.[5]

The defendant asked Alston if he would like to join them but Alston refused. The defendant berated him for his refusal, calling him derogatory names. Alston tried unsuccessfully to dissuade Jackson from proceeding with the plan. The next morning, Monday, April 29, 1996, at 10 a.m., the defendant arrived at Jackson's apartment and awoke Jackson and Alston. Again he tried to persuade Alston to join them. Being unsuccessful, he again vilified Alston.

Shortly before noon, Jackson and the defendant drove toward Hillhouse High School in the defendant's blue pickup truck. En route, Jackson spotted his friend, Douglas Bethea, who was fifteen years old, a truant from Transitional High School. The defendant and Jackson enlisted Bethea in the venture. Thereafter, the defendant parked his truck in a Walgreens' store parking lot near the bank. He supplied Bethea with a pair of black nylon stockings to cover his face during the robbery. Jackson and Bethea walked to the bank and entered it at approximately 12:55 p.m. Bethea was wearing the stocking over his head, but Jackson entered barefaced. Both approached teller Patricia Byrd, who recognized Jackson because he had participated in robbing the bank approximately one month earlier. Byrd indicated her fear and moved to the teller station to her left. Jackson followed Byrd, brandished a gun, demanded money and fired a shot into the wall behind

---

[5] On the day of the robbery, the defendant was armed with a nine millimeter pistol.

the teller station. Byrd ducked under the counter while Cynthia Daniels, another teller, agreed to give them money and passed over approximately $1200 to $1300. Jackson and Bethea, who was carrying the money in a bag, then exited the bank through the back door and ran to the truck. Along the way, while Bethea was jumping over a fence, his right sneaker became stuck on top of the fence and a dye pack exploded in the bag, covering the money. Bethea then left the bag behind.

Thereafter, Jackson and Bethea entered the truck, which was parked in front of Walgreens, and Jackson drove it along the street to where they picked up the defendant and proceeded to Jackson's apartment. At the apartment, the defendant was livid upon discovering that Jackson and Bethea only netted $20 from the robbery. After listening to his police scanner reporting police activity at Centerbank, the defendant decided that they should rob the Bank of Boston branch on Whalley Avenue and attempted to get Bethea to go with them, but Bethea resisted.

The defendant then drove Jackson and Bethea to a Blimpie's restaurant near the Bank of Boston branch and instructed Jackson to buy something to obtain a bag. Jackson complied and emerged with a bag with a Blimpie's logo on it. Thereafter, the defendant drove up a hill and around the corner from the bank and remained in the truck while Jackson and Bethea walked down the hill toward the bank.

At approximately 2:30 p.m., Jackson, wearing a black mask, entered the bank and approached teller Jodie Patel.[6] He fired his gun into a wall and demanded money. She complied and placed approximately $8000 on the counter, which Jackson placed in the Blimpie's bag.

---

[6] Bethea had refused to enter the second bank and walked to a nearby bus stop, where he remained until Jackson left the bank. Upon seeing Jackson exit the bank, Bethea proceeded to take a bus downtown.

Jackson left the bank and returned home. The entire episode took about one hour. Upon arriving home, Jackson told Alston, "I did it." Later, Jackson called the defendant to arrange for the purchase of a dirt bike motorcycle. Despite Alston's warning about buying the dirt bike on the same day as the robbery, Jackson purchased a dirt bike with the proceeds of the robbery, and the defendant later purchased a used Cadillac. Later that same afternoon, Bethea and his mother came to Jackson's apartment for Bethea's share of the proceeds. Jackson gave Bethea some money and informed him that he would have to obtain the balance from the defendant.

Approximately two weeks after the robbery, the New Haven police department obtained statements from Alston and Bethea. Alston implicated the defendant, Jackson and Bethea. Bethea initially denied any involvement, but later stated that he had been forced to commit the Centerbank robbery, and identified the defendant and Jackson as those involved.

The defendant claims that the trial court improperly denied his motion to dismiss the information because there was insufficient evidence to support his conviction. We do not agree.

"In reviewing a sufficiency of the evidence claim, we must apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . *State* v. *Sivri*, 231 Conn. 115, 126, 646 A.2d 169 (1994). . . . *State* v. *Potts*, 55 Conn. App. 469, 471, 739 A.2d 1280, cert. denied, 252 Conn. 905, 743 A.2d 616 (1999).

"It is well settled that in reviewing a defendant's challenge to a verdict based on insufficient evidence, we defer to the jury. *State* v. *Brunori*, 22 Conn. App. 431, 434–35, 578 A.2d 139, cert. denied, 216 Conn. 814, 580 A.2d 61 (1990). We do not sit as a [seventh] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. We have not had the jury's opportunity to observe the conduct, demeanor, and attitude of the witnesses and to gauge their credibility. *State* v. *Stepney*, 191 Conn. 233, 255, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984). The scope of our factual inquiry on appeal is limited. This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . . *State* v. *Hart*, 198 Conn. 424, 427, 503 A.2d 588 (1986). [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . . *State* v. *Scielzo*, 190 Conn. 191, 197, 460 A.2d 951 (1983). . . . *State* v. *Brown*, 235 Conn. 502, 510, 668 A.2d 1288 (1995)." (Emphasis in original; internal quotation marks omitted.) *State* v. *Young*, 56 Conn. App. 831, 835–36, 746 A.2d 795, cert. denied, 253 Conn. 904, 753 A.2d 939 (2000).

On the basis of the testimony of the two bank tellers, Byrd and Daniels, who stated that only one actor in each robbery could be identified, the defendant argues that there was a substantial issue of fact as to who committed the robberies and whether there was any agreement between the defendant and Jackson. The defendant also asserts that the testimony of Alston and Bethea, the witnesses produced by the state to describe his participation in the conspiracy, was tainted or incredible because Alston and Bethea were hoping to receive lenient treatment in criminal cases that were

pending against them in exchange for their testimony. This claim is without merit.

We note that it is "the absolute right and responsibility of the jury to weigh conflicting evidence and to determine the credibility of the witnesses. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . If evidence . . . should convince a jury beyond a reasonable doubt that an accused is guilty, that is all that is required for a conviction." (Citations omitted; internal quotation marks omitted.) *State v. White*, 55 Conn. App. 412, 417, 740 A.2d 399, cert. denied, 252 Conn. 908, 743 A.2d 621 (1999). "The jury is free to weigh the credibility of a witness whose self-interest may motivate him to be less credible. See *State v. Cooke*, 42 Conn. App. 790, 796, 682 A.2d 513 (1996)." *State v. Preston*, 46 Conn. App. 778, 787, 700 A.2d 1190 (1997), rev'd on other grounds, 248 Conn. 472, 728 A.2d 1087 (1999). The jury, therefore, was entitled to credit the testimony of Alston and Bethea regarding the defendant's participation in the robberies.[7]

After reviewing the evidence in the light most favorable to sustaining the verdict, we conclude that the jury reasonably could have concluded from the facts and the inferences reasonably drawn therefrom that the evidence established beyond a reasonable doubt that the defendant had committed the crimes as charged.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[7] Likewise, the jury was entitled to believe or not believe the testimony of Byrd and Daniels. Because the defendant was charged and convicted under a theory of accessorial liability and not as a principal, however, the defendant's argument that the evidence was insufficient to demonstrate that he had entered either bank or was carrying a pistol is without merit.